**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR10-4025-MWB |
| vs. | **MEMORANDUM OPINION AND ORDER REGARDING SENTENCING** |
| STEVEN KEITH VANDEBRAKE, | |
| Defendant. | |
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CR10-4028-MWB |
| vs. | **MEMORANDUM OPINION AND ORDER REGARDING SENTENCING** |
| KENT ROBERT STEWART, | |
| Defendant. | |

_____

**TABLE OF CONTENTS**

*I.* **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    *A.* ***The Charges And The Guilty Pleas*** . . . . . . . . . . . . . . . . . . . . . . . 6
        *1.* ***Defendant VandeBrake*** . . . . . . . . . . . . . . . . . . . . . . . . . 6
        *2.* ***Defendant Stewart*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        *3.* ***Notice of intent to consider an upward variance*** . . . . . . . . . 8
        *4.* ***Sentencing hearing*** . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    *B.* ***Offense Conduct*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        *1.* ***Defendant VandeBrake*** . . . . . . . . . . . . . . . . . . . . . . . . 10
            *a.* ***Background and the investigation*** . . . . . . . . . . . . . . 10
            *b.* ***Evidence related to Count One*** . . . . . . . . . . . . . . . 13
            *c.* ***Evidence related to Count Two*** . . . . . . . . . . . . . . 14
            *d.* ***Evidence related to Count Three*** . . . . . . . . . . . . . 15

        *e.*    *Volume of commerce attributable to VandeBrake*  . . .  15

     **2.**    **Defendant Stewart** . . . . . . . . . . . . . . . . . . . . . . . . . 16

        *a.*    *Background and the investigation* . . . . . . . . . . . . . 16

        *b.*    *Evidence related to the Information* . . . . . . . . . . 18

        *c.*    *Disputed bid-rigging projects*  . . . . . . . . . . . . . 19

             *i.*    *Sibley Airport patching project* . . . . . . . . . . 19

             *ii.*    *East Okoboji beach project* . . . . . . . . . . . . 21

             *iii.*    *Spencer Lincoln School project* . . . . . . . . . . 26

        *d.*    *Price-fixing—price sheets* . . . . . . . . . . . . . . . . 29

   *C.*  **Defendant's Personal Characteristics**  . . . . . . . . . . . . . . . . 34

     **1.**    **Defendant VandeBrake** . . . . . . . . . . . . . . . . . . . . . . 34

     **2.**    **Defendant Stewart** . . . . . . . . . . . . . . . . . . . . . . . . . 36

*II.* **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

   *A.*  **Breach Of The Plea Agreement In Stewart's Case** . . . . . . . . 39

     **1.**    **The applicable two-step analysis**  . . . . . . . . . . . . . . 40

     **2.**    **Determination of the breach** . . . . . . . . . . . . . . . . . . 40

   *B.*  **The Methodology For Determination Of A Sentence** . . . . . . 44

   *C.*  **Policy Disagreements With Sentencing Guidelines**  . . . . . . . . 46

   *D.*  **Determination Of The Guidelines Sentence**  . . . . . . . . . . . . 49

     **1.**    **Defendant VandeBrake** . . . . . . . . . . . . . . . . . . . . . . 49

     **2.**    **Defendant Stewart** . . . . . . . . . . . . . . . . . . . . . . . . . 51

   *E.*  **Determination Of Whether To Depart** . . . . . . . . . . . . . . . . 52

     **1.**    **Defendant VandeBrake**  . . . . . . . . . . . . . . . . . . . . . 54

     **2.**    **Defendant Stewart** . . . . . . . . . . . . . . . . . . . . . . . . . 54

        *a.*    *Departure under U.S.S.G. § 5K1.1* . . . . . . . . . . . 55

        *b.*    *Departure under U.S.S.G. § 5K2.11* . . . . . . . . . . 58

        *c.*    *Departure under U.S.S.G. § 5K2.12* . . . . . . . . . . 62

        *d.*    *Departure under U.S.S.G. § 5K2.0* . . . . . . . . . . . 64

   *F.*  **Do § 3553(a) Considerations Justify A Variance?** . . . . . . . . 67

     **1.**    **The § 3553(a) Factors** . . . . . . . . . . . . . . . . . . . . . . 67

     **2.**    **Defendant VandeBrake**  . . . . . . . . . . . . . . . . . . . . . 68

        *a.*    *The nature and circumstances of the offense/need for*

             *sentence* . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

        *b.*    *The history and characteristics of the defendant* . . . . 80

        *c.*    *The kinds of sentences available* . . . . . . . . . . . . 87

        *d.*    *Any pertinent policy statement* . . . . . . . . . . . . . 89

2

       *e.*      *Avoiding unwarranted sentencing disparities* . . . . . .  89

       *f.*       *Remaining § 3553(a) factor* . . . . . . . . . . . . . . . .  92

       *g.*     *Fine* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  93

       *h.*     *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . .  95

       *i.*       *Alternative sentence of imprisonment* . . . . . . . . . . .  96

   *3.*      *Defendant Stewart* . . . . . . . . . . . . . . . . . . . . . . . . . . .  97

       *a.*     *The nature and circumstances of the offense/need for*

               *sentence* . . . . . . . . . . . . . . . . . . . . . . . . . . . .  98

       *b.*     *The history and characteristics of the defendant* . . . .  100

       *c.*      *The kinds of sentences available* . . . . . . . . . . . . . .  101

       *d.*     *Any pertinent policy statement* . . . . . . . . . . . . . . .  102

       *e.*      *Avoiding unwarranted sentencing disparities* . . . . . .  102

       *f.*       *The need to provide restitution* . . . . . . . . . . . . . . .  105

       *g.*     *Fine* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  106

       *h.*     *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . .  106

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  107

  *A. VandeBrake* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  107

  *B. Stewart* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  108

Writer Pearl S. Buck cogently observed in her novel *The Good Earth*, "Hunger makes a thief of any man." Defendants Steven Keith VandeBrake and Kent Robert Stewart came before the court for sentencing on February 8, 2011, for violations of the Sherman Act, 15 U.S.C. § 1. Neither defendant, however, suffered from hunger, at least as Pearl Buck knew it, but from insatiable greed, which is all the more shocking because both were already wealthy, multi-millionaire businessmen. Sir Francis Bacon wrote, "Opportunity makes a thief." While Stewart's greed was at least tempered a modicum by Stewart's

misguided motivation to ensure the jobs and livelihood of his employees, VandeBrake's appalling greed knew no such bounds and was fueled by the unique ease and opportunity that his industry, concrete sales, gave him in establishing a concrete cartel in northwest Iowa.[1] The defendants, although dressed in the attire of hard working businessmen, were nothing more than common thieves, and serial ones at that. Like a neighborhood thief, they stole from friends, acquaintances, businesses and local governments.[2] The defendants tools of their trade were not dark clothing worn in midnight burglaries facilitated by pry bars and screw drivers. Instead, in ordinary business attire and in the glare of broad daylight, they used the ordinary communication tools of modern commerce and business, cell phones, Blackberries, and e-mail to rob their victims. Unlike the neighborhood thief who values high end TV's, computers, jewelry, and furs, the defendants specialized in cold hard cash. Unlike the neighborhood thief whose victims immediately recoiled in shock at the loss of their property, the defendants stole from their victims without them ever

---

[1] More than 230 years ago, the noted Scottish pioneering political economist, Adam Smith observed:

> People of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices. It is impossible indeed to prevent such meetings, by any law which either could be executed, or would be consistent with liberty and justice.

ADAM SMITH, THE WEALTH OF NATIONS, (1776).

[2] As will be discussed in greater detail in this opinion, VandeBrake's greed went so far as to double-cross one of his co-conspirators, Siouxland Concrete Co. ("Siouxland"). VandeBrake underbid a project that VandeBrake and Siouxland had previously agreed would be awarded to Siouxland.

knowing it.  Their actions, clever and cunning, but taken with full knowledge and intent to violate this Nation's criminal antitrust laws.[3]

The court recognizes that the parties are heavily invested in the two plea agreements worked out between the defendants and the prosecution.  Defense counsel, being vigorous advocates for the defendants, quite rightly endeavored to negotiate the best possible deal for their clients.  The prosecution, on the other hand, has a broader obligation.  As Justice Sutherland explained so eloquently some seventy years ago,

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States,* 295 U.S. 78, 88 (1935); *see* MODEL RULE OF PROF'L CONDUCT R. 3.8 cmt. [1] (2007) ( The prosecution has the responsibility to be "a minister of justice and not simply that of an advocate.").  To those ends, the prosecution has worked diligently to "do justice" in these cases through the terms of the plea agreements worked out with the defendants.  The prosecution's view, however, is hampered because it comes to these cases with a perspective narrowed by its prosecution of only antitrust cases.  With

---

[3]VandeBrake acknowledged during questioning by the court that he had read in trade journals he received about the prosecutions of others in his industry for antitrust violations.

all due respect, the prosecution lacks the undersigned's breadth of experience, which comes from presiding over more than 2,600 sentencings, on a wide array of criminal conduct, in over sixteen years on the federal bench. The court's role and duties differ from both that of the prosecution and defense counsel. As Judge Learned Hand observed, "[a] judge is more than a moderator; he is charged to see that the law is properly administered and it is a duty which he cannot discharge by remaining inert." *United States v. Marzano*, 149 F.2d 923, 925 (2d Cir. 1945). The court finds that the defendants' offenses are very serious, and the court must consider whether sentences for them in strict accordance with the advisory guideline for antitrust offenses would be at odds with the "parsimony provision" of the federal sentencing statute, 18 U.S.C. § 3553(a), which directs the court to impose a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing. The court concludes that VandeBrake's conduct warrants an upward variance in his sentence but Stewart's does not. This memorandum explains in greater detail the court's rationale for the sentences imposed.

## I. INTRODUCTION

### A. The Charges And The Guilty Pleas

#### 1. Defendant VandeBrake

In a three-count Information filed in *United States v. VandeBrake*, CR10-4025-MWB (docket no. 2) on April 26, 2010, VandeBrake is charged with three violations of the Sherman Act, 15 U.S.C. § 1, each count charging that VandeBrake entered into and engaged in a combination and conspiracy to suppress and eliminate competition by fixing

prices and/or rigging bids for the sales of ready-mix concrete in unreasonable restraint of interstate trade and commerce.[4]

On May 4, 2010, VandeBrake appeared before Chief United States Magistrate Judge Paul A. Zoss and entered a plea of guilty to Counts 1, 2, and 3 of the Information. On this same date, Judge Zoss filed a Report and Recommendation in which he recommended that VandeBrake's guilty plea be accepted. At the time of VandeBrake's guilty plea hearing, he plead under a binding plea agreement, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). On May 26, 2010, in compliance with Federal Rule of Criminal Procedure 11(c)(5), the court informed VandeBrake, in open court, that it was rejecting the Rule 11(c)(1)(C) plea agreement, and gave VandeBrake the opportunity to withdraw his guilty plea. VandeBrake declined to withdraw his guilty plea. Instead, VandeBrake and the prosecution reached a plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B). Pursuant to Federal Rule of Criminal Procedure 11(c)(3)(B), the court informed VandeBrake that, under his new plea agreement, he had no right to withdraw his guilty plea if the court failed to follow the sentencing recommendation or request contained in his Rule 11(c)(1)(B) plea agreement. On May 26, 2010, the court accepted Judge Zoss's Report and Recommendation and accepted VandeBrake's plea of guilty in this case to Counts 1, 2, and 3 of the Information.

---

[4]Ready-mix concrete is a product whose ingredients are cement, aggregate (sand and gravel), water, and, at times, other additives. Ready-mix concrete is used in various types of construction projects, including buildings and roads. Ready-mix concrete is generally produced in a concrete plant and then transported to a construction site by a cement-mixer truck.

### 2.    *Defendant Stewart*

On May 6, 2010, in *United States v. Stewart*, CR10-4028-MWB, a single count Information (docket no. 2) was filed charging that between January 2008 and August 2009, Stewart entered into and engaged in a combination and conspiracy to suppress and eliminate competition by fixing prices and rigging bids for the sales of ready-mix concrete in unreasonable restraint of interstate trade and commerce, in violation of the Sherman Act, 15 U.S.C. § 1.   On May 24, 2010, Stewart appeared before Judge Zoss and entered a plea of guilty to Count 1 of the Information, pursuant to a written plea agreement made pursuant to Federal Rules of Criminal Procedure 11(c)(1)(A) and 11(c)(1)(B).  On May 25, 2010, Judge Zoss filed a Report and Recommendation in which he recommended that Stewart's guilty plea be accepted.  On May 26, 2010, the court accepted Judge Zoss's Report and Recommendation and accepted Stewart's plea of guilty in this case to Count 1 of the Information.

### 3.    *Notice of intent to consider an upward variance*

On October 21, 2010,  I sent the parties a six-page letter informing them that I was considering an upward variance for both defendants, possibly to the statutory maximums for both the fine and term of imprisonment, on a number of grounds.[5]  Specifically, I informed the parties that I was considering the following:  (1) whether the base offense level found in United States Sentencing Guideline § 2R1.1 accurately reflects the

---

[5]Although I was not required give notice, pursuant to Rule 32(h) of the Federal Rules of Criminal Procedure, of its intent to consider an upward variance, s*ee United States v. Foy*, 617 F.3d 1029, 1035 (8th Cir. 2010); *United States v. Wiley*, 509 F.3d 474, 476 (8th Cir. 2007); *United States v. Levine*, 477 F.3d 596, 606 (8th Cir. 2007); *United States v. Sitting Bear*, 436 F.3d 929, 932-33 (8th Cir. 2006); *United States v. Long Soldier*, 431 F.3d 1120, 1122 (8th Cir. 2005); *United States v. Egenberger*, 424 F.3d 803, 805 (8th Cir. 2005), I, nevertheless, did so in the interests of justice and fairness.

seriousness of the charged antitrust offenses; (2) whether the Specific Offense Characteristic located in United States Sentencing Guideline § 2R1.1(b)(1) is sufficient to reflect the seriousness of the non-competitive bidding, particularly in the case of VandeBrake, when his conduct took place in three separate conspiracies; (3) whether the Specific Offense Characteristic located in United States Sentencing Guideline § 2R1.1(b)(2) accurately reflects the seriousness of the charged offenses given its special treatment of relevant conduct; (4) whether the grouping guideline, U.S.S.G. § 3D1.3(b), gives sufficient weight to the fact that VandeBrake has plead guilty to three separate counts of conspiracy; and (5) whether an upward variance was warranted after considering all of the factors found in 18 U.S.C. § 3553(a).

### *4. Sentencing hearing*

A consolidated sentencing hearing for VandeBrake and Stewart began on December 7, 2010 and went into the next day. At the hearing, the prosecution presented documentary evidence and the testimony of the following witnesses: Ryan Lake, a former employee of Alliance Concrete, Inc. and GCC Alliance Concrete, Inc.; Lee Konz, a former employee of Alliance Concrete, Inc. and GCC Alliance Concrete; Peter Brewin, GCC Alliance Concrete, Inc.'s Vice President of ready-mix and aggregates for the United States; Kent Byers, a special agent for the United States Department of Transportation; and Jon Moeller, a Federal Bureau of Investigation special agent.[6] VandeBrake offered documentary evidence and his own testimony. Stewart offered documentary evidence, his own testimony, and the testimony of Dennis Rode and Brian Bosshart, both of whom are part-owners of Great Lakes Concrete, and Carol Kleve, Great Lakes Concrete's

---

[6]Lake and Konz both testified pursuant to orders of the court granting them testimonial immunity.

bookkeeper. The court heard oral arguments from the parties the following week, on December 15, 2010. Rather than imposing sentence that day, in order to permit the court to give due consideration to its concerns regarding the appropriateness of upward variances under the Sentencing Guidelines and to determine the appropriate sentences for VandeBrake and Stewart, the court completed the consolidated sentencing hearing on February 8, 2011. The court now states, in some detail, the reasons for the sentences imposed on VandeBrake and Stewart in their respective cases.

## B. Offense Conduct

### 1. Defendant VandeBrake

The Presentence Investigation Report ("PSIR") for VandeBrake reveals the following offense conduct.

#### a. Background and the investigation

VandeBrake was the Sales Manager of GCC Alliance Concrete, Inc. ("GCC") until August or September 2009. GCC is an Iowa corporation which is wholly owned by Grupo Cementos de Chihuahua, a Mexico based corporation which operates approximately twenty-three cement plants in Iowa. In January 2008, GCC was formed when Grupo Cementos de Chihuahua purchased Alliance Concrete, Inc. ("Alliance") from its former owners, which included the VandeBrake family. Alliance was formed in 2006 when Joe's Ready Mix, based in Sioux Center, Iowa, and owned by the Sandbulte family, merged with Russell's Ready Mix, based in Orange City, Iowa, and owned by the VandeBrake family. Alliance was operated by members of both the Sandbulte family and the VandeBrake family. VandeBrake was Alliance's President prior to its purchase by Grupo Cementos de Chihuahua.

In March 2009, Siouxland Concrete Co. ("Siouxland") reported a bid-rigging conspiracy in Sioux City, Iowa, between two Siouxland employees and VandeBrake to the United States Department of Justice's Antitrust Division.[7] As a result of Siouxland's report, Antitrust Division personnel interviewed the two Siouxland employees, CW-1 and CW-2. CW-1 and CW-2 confirmed that a conspiracy existed to rig bids for ready-mix concrete sales in connection with construction projects in Sioux City, Iowa. The conspiracy began in June 2008, when CW-1 and VandeBrake began meeting, and ended in March 2009, when Siouxland reported it to the Antitrust Division. In March 2010, CW-1 also admitted to meeting with VandeBrake in the second half of 2008 to discuss and reach an agreement relating to price increases on their 2009 price lists. VandeBrake and CW-2 had communications where they discussed bidding on two projects, construction of a water treatment plant in Sioux City, Iowa, and construction at Dordt College, and agreed to allocate one project to each company with the other company submitting a highly competitive bid.[8]

---

[7]Siouxland's report to the Justice Department was made pursuant to the Antitrust Division's Leniency Program. The Antitrust Division's Leniency Program permits a company or individual to avoid criminal charges for antitrust violations provided the reporting company or individual is the first member of a conspiracy to report the criminal activity and meet other requirements of the program. *See* http://www.justice.gov/atr/public/criminal/leniency.htm (last visited January 9, 2011).

[8]These two projects were not awarded as agreed between VandeBrake and CW-2. Although Siouxland was designated to win the Sioux City water treatment plant project, VandeBrake double-crossed CW-2 by reneging on their agreement and having GCC submit a bid which undercut Siouxland's bid by approximately $1 per cubic yard. Similarly, while GCC was designated to win the Dordt College project, the project was rebid later in 2009, so the rigged bids in April 2009 were not used for awarding the project.

As part of the investigation, VandeBrake's BlackBerry mobile device was searched. This search revealed that the device's address book listed contact information for the presidents of two other concrete competitors in northwest Iowa, Chad Van Zee, President of Tri-State Ready Mix, Inc. ("Tri-State") and Stewart, the President of Great Lakes Concrete, Inc. ("Great Lakes"). Van Zee and Stewart's telephone records revealed multiple telephone calls between Van Zee and VandeBrake, and over one hundred telephone calls between Stewart and VandeBrake. An email dated January 22, 2008, from GCC sales representative Ryan Lake to VandeBrake referred to an agreement with Stewart.

In October 2009, Lake confirmed the existence of a bid-rigging conspiracy between VandeBrake and Stewart. Lake told Antitrust Division investigators that VandeBrake provided him with prices to bid on projects after communicating with Stewart about Stewart's planned bid. Lake and CW-2 identified Lee Konz, a former GCC sales representative and currently a GCC operations manager, as being involved in the conspiracies relating to Siouxland and Great Lakes. Lake and CW-2 each stated that Konz assumed VandeBrake's role in the conspiracy when VandeBrake was out of town or otherwise unavailable. David Bierman, a GCC sales Representative, admitted that, on the day a search warrant was executed for GCC's business office, he shredded a price map containing a list of prices to be quoted for specific regions. Bierman stated he received the price map from VandeBrake, who told Bierman that the price map reflected an agreement between VandeBrake and Van Zee concerning their respective companies' prices for the region.

In November 2009, search warrants were executed on the business offices of Great Lakes and Tri-State. On the day of the searches, Stewart and Van Zee were interviewed at their homes. Stewart admitted to a bid-rigging conspiracy with VandeBrake in which,

during telephone conversations, they would discuss prices to bid for ready-mix concrete sales in connection with construction projects in the area, in and around Dickinson County, Iowa, where Great Lakes competed with GCC. Stewart also confirmed that Konz was another individual at GCC with whom he discussed bid prices. In a subsequent interview, Stewart admitted rigging multiple bids with VandeBrake in 2008 and 2009. Stewart further admitted that he initiated the anticompetitive communications with VandeBrake when he proposed to VandeBrake that each of their respective companies stay within its local territory. According to Stewart, VandeBrake was receptive to his proposal. After these discussions, Stewart and VandeBrake began having regular contact regarding projects and other business matters. Although there was no formal end to the conspiracy, in June 2009, Stewart and VandeBrake ceased rigging bids because both companies had bid and won a very large project through a joint venture. As a result, Great Lakes's entire production capacity was taken up by this project.

Van Zee admitted to having discussions with VandeBrake before each of their companies would issue their respective annual price lists for concrete. Tri-State and GCC compete for projects in the area between Rock Valley, Iowa, where Tri-State is based, and Sioux Center, where GCC has a plant. According to Van Zee, for the last three to five years, including 2009, VandeBrake told Van Zee what price he was putting on his price list for the area where both Tri-State and GCC compete, and that Van Zee would then post a similarly price on Tri-State's price list.

### b.     *Evidence related to Count One*

Interviews with CW-1 and CW-2 disclosed a two-company conspiracy involving Siouxland and GCC. This conspiracy started in June 2008, and ended in early March 2009, when Siouxland contacted the Antitrust Division and involved two types of agreements. First, according to CW-1, there was an agreement between him and

VandeBrake concerning price increases on their companies' respective 2009 price lists. After Siouxland acquired a competitor in GCC's sales area, CW-1 and VandeBrake had two meetings in the second half of 2008 in which they discussed the need to "get prices up" and agreed to do so on their 2009 price lists. Although GCC's total sales in January and February 2009 for the affected area was approximately $650,000, because the majority of these sales were for a single project that was not a subject of the conspiracy, the commerce affected by the conspiracy is $250,000. Second, according to CW-1 and CW-2, there was an agreement between CW-1, CW-2, and VandeBrake to rig ready-mix concrete bids for specific construction projects in the Sioux City area. CW-1 and CW-2 met with VandeBrake in late 2008, and CW-2 followed up on that discussion through meetings and telephone conversations with VandeBrake, and at least once with Lee Konz, during which approximately 15 to 18 bids were rigged. GCC had sales resulting from two of the affected bids.[9] According to GCC's sales records, the volume of commerce attributable to GCC for these projects is $341,000. Thus, the total volume of commerce attributable to VandeBrake for Count One is $591,000.

### c.  *Evidence related to Count Two*

Interviews with Ryan Lake, a GCC sales representative, and Stewart, revealed a two-company conspiracy involving Great Lakes and GCC. This conspiracy started in January 2008 and ended in August 2009. Stewart admitted to having telephone conversations with VandeBrake and Konz where they rigged bids on 12 to 15 projects. According to GCC's sales records, GCC had sales relating to four of the rigged bids, and the volume of commerce attributable to GCC for these projects is $95,000.

---

[9]The low number of projects awarded to GCC based on the rigged bids resulted from a majority of the rigged bids being allocated to Siouxland, that GCC lost some bids even when it had the agreed-upon low price, and that some projects were cancelled.

### d. *Evidence related to Count Three*

Interviews with David Bierman and Chad Van Zee disclosed a two-company conspiracy involving Tri-State and GCC. This conspiracy started as early as January 2006 and ended in August 2009, and did not involve bid rigging. Instead, this conspiracy involved the annual price lists that were provided to customers by both companies. Bierman revealed that, in early 2009, VandeBrake gave him a price map that reflected an agreement on pricing in 2009 between VandeBrake and Van Zee. Van Zee admitted that, for the past three to five years, VandeBrake would call him early in the year to provide VandeBrake's planned pricing for the area, between Rock Valley, Iowa, and Sioux Center, Iowa, where Tri-State and GCC's sales territories overlapped. Van Zee would not provide his prices in return but, following VandeBrake's telephone calls, Van Zee would list a price based on VandeBrake's price list for that area. The volume of affected commerce for Count 3 is $4,845,439.61.

### e. *Volume of commerce attributable to VandeBrake*

VandeBrake and Stewart's sentences are based upon the United States Sentencing Guidelines. The guidelines for antitrust offenses in turn are driven by the volume of commerce attributable to an individual defendant. *See* U.S.S.G. § 2R1.1(b)(2). The guidelines' offense level for antitrust offense increases as the volume of commerce attributable to a defendant increases.[10] *See id.* Here, based on the facts discussed above, the total volume of commerce attributable to VandeBrake is $5,666,348.61.[11]

---

[10]For the purposes of the § 2R1.1 guideline, "the volume of commerce attributable to an individual participant in a conspiracy is the volume of commerce done by him or his principal in goods or services that were affected by the violation." U.S.S.G. § 2R1.1.

[11]This calculation is based on the following volume of commerce attributable to
(continued...)

## 2. Defendant Stewart

Stewart's PSIR reveals the following offense conduct.

### a. Background and the investigation

Stewart is President of Great Lakes and manages its business operations. Great Lakes is an Iowa corporation with its principal place of business in Ocheyedan, Iowa. Great Lakes was formed in 2004 when Northwest Ready-Mix merged with another company also called Great Lakes. Prior to the merger, Stewart owned and operated Northwest Ready-Mix. Following the merger, Stewart became president and part-owner of the newly formed Great Lakes, and took responsibility for operating the entire merged company.[12]

As part of the investigation of VandeBrake, VandeBrake's BlackBerry mobile device was searched. This search revealed that the device's address book listed contact information for Stewart. Investigators followed up this lead by obtaining Stewart's telephone records, which revealed over 100 telephone calls between VandeBrake and Stewart. In reviewing records seized from GCC, the investigators also discovered an

---

[11](...continued)
VandeBrake for each of the three counts:

|            |             |
|------------|-------------|
| Count One: | $ 591,000.00 |
| Count Two: | $   95,000.00 |
| Count Three: | $4,980,348.61 |
| Total: | $5,666,348.61 |

[12]After the merger, Stewart shared ownership with Norlyn VandeBrake, Steven VandeBrake's father, Dennis Rode and Brian Bosshart. Stewart and Norlyn VandeBrake each owns one third of the company while Rode and Bosshart each owns a one-sixth share of the company.

email dated January 22, 2008, from GCC sales representative, Ryan Lake, to VandeBrake which made reference to an agreement with Stewart.

In October 2009, investigators interviewed a number of GCC sales representatives, including Lake and Konz. Lake confirmed the existence of a bid-rigging conspiracy between VandeBrake and Stewart. Lake told the investigators that VandeBrake provided Lake with prices to bid on projects after he communicated with Stewart about Stewart's planned bid. In November 2009, Stewart was interviewed by investigators at his home. Stewart admitted to a bid-rigging conspiracy with VandeBrake in which they would have telephone discussions about prices to bid on ready-mix concrete sales in connection with construction projects in and around Dickinson and Clay Counties where Great Lakes competed with GCC. Stewart identified Konz as another individual at GCC with whom he discussed bid prices. Stewart denied having pricing discussions with any other competitor.

In a later interview, Stewart admitted rigging multiple bids with VandeBrake in 2008 and 2009. Stewart also admitted to discussing Great Lake's annual price list with VandeBrake, but denied that any sort of agreement had been made regarding the price list. Stewart further admitted that he initiated communications with VandeBrake when he proposed to VandeBrake that each of their respective companies should stay within its local territory. VandeBrake was receptive to Stewart's overture. Further discussions between Stewart and VandeBrake took place in late 2007 or early 2008. After these discussions, Stewart and VandeBrake started to have regular contact concerning projects and other business matters, and ultimately reached an agreement to rig bids on ready-mix concrete projects. The evidence at the sentencing hearing was in equipoise as to who initiated the

conversation which lead to the bid-rigging conspiracy between the two men.[13]  There was no formal end to the conspiracy, but in June 2009, Stewart and VandeBrake ceased rigging bids because both companies had bid and won a very large project through a joint venture. As a result, Great Lakes's entire production capacity was taken up by this project.

### b.    Evidence related to the Information

Interviews with Stewart and Lake disclosed a two-company conspiracy involving Great Lakes and GCC.  This conspiracy started in January 2008 and ended in August 2009.  Stewart admitted to having telephone conversations with VandeBrake and Konz where they rigged bids on 12 to 15 projects.  According to Great Lakes's sales records, Great Lakes had sales relating to six of the rigged bids, and the volume of commerce attributable to Great Lakes for these projects is $743,001.95.  Stewart disputes three additional projects: the Sibley Airport patching project; the East Okoboji project; and the Spencer Lincoln School project.  In addition, Stewart disputes that he and VandeBrake had a price-fixing arrangement in addition to their bid-rigging scheme.  The court will first consider each of the three disputed bid-rigging projects and then turns its attention to the question of whether Stewart was involved in a price-fixing conspiracy with VandeBrake that involved their respective companies' price lists.

---

[13] Although the court cannot determine, on the evidence before it, who initiated the conspiracy between Stewart and VandeBrake, the fact that VandeBrake was responsible for initiating the other two charged conspiracies has not gone unnoticed.  This circumstance alone makes it entirely plausible that VandeBrake was the party responsible for starting the conspiracy between him and Stewart.  After all, VandeBrake had already taken the initiative to commence antitrust conspiracies with two other competitors of GCC in northwest Iowa.  Having done so twice already, VandeBrake would possess even more motivation to go to the next step and commence a conspiracy with Stewart since, by doing so, VandeBrake would have effectively created his own concrete cartel in northwest Iowa.

### c.    *Disputed bid-rigging projects*

### i.    *Sibley Airport patching project*

The parties initially dispute whether Stewart and VandeBrake fixed bids for the Sibley Airport patching project. The Sibley Airport patching project was for patching the runway at the Sibley Airport. The Sibley Airport is on the south side of Sibley. The project's specifications called for a M4 concrete mix to be used. M4 concrete is a high cement content concrete patching mix required by the State of Iowa for certain public projects. M4 concrete mix's unique characteristics allow it to fully set in approximately twelve hours. State regulations require that the pouring of M4 concrete mix be completed within one hour of the start of loading the cement onto the delivery truck. If the M4 concrete mix is not unloaded within the one hour window, the load is sent back to the originating concrete plant. This may result in the M4 concrete mix beginning to harden in the drum of the concrete delivery truck. If the M4 concrete mix becomes too hardened on the return trip, the drum of the cement delivery truck, costing $10,000, may have to be discarded.

On February 17, 2009, Ryan Lake submitted GCC's winning bid for concrete for the Sibley Airport patching project to Ten Point Construction. GCC bid $119 per cubic yard for 220 yards of M4 concrete mix. *See* Government Ex. I, GCC Standard Quotation and Contract Form. Great Lakes submitted no bid for the project. Stewart testified that he had no agreement with VandeBrake for the project. He further testified that Great Lakes submitted no bid for the Sibley Airport patching project because it called for M4 concrete mix and the project's location was too far away from Great Lakes's nearest concrete plant to ensure delivery within one hour.

Contesting Stewart's assertion that he did not fix bids with VandeBrake for the project, the prosecution points to what it believes are inconsistencies in Stewart's

testimony. Specifically, the prosecution points to previously made statements by Stewart that Stewart and VandeBrake had discussed staying within each company's normal business areas; that Stewart had previously sold concrete in Sibley; that Stewart had threatened to expand Great Lakes's business in Sibley as a result of GCC underbidding him on the Milford fire station project; and that Stewart would expect VandeBrake to speak to him about any project which arose in Sibley. The gist of the prosecution's argument is that Stewart's prior statements show that any concrete projects in Sibley would be considered to be in disputed territory and the subject of discussions between Stewart and VandeBrake. The prosecution buttresses its argument by directing the court's attention to VandeBrake and Ryan Lake's testimony at the sentencing hearing. VandeBrake testified that he talked to Stewart about the Sibley Airport patching project, indicating that he wanted that project for GCC. VandeBrake testified that Stewart responded by telling him, "don't worry about it." Ryan Lake testified that VandeBrake gave him the price to bid on the project and that Lake viewed the bid price as high for a project around Sibley.

The court finds Stewart's testimony regarding the Sibley Airport patching project to be credible and concludes that the prosecution has not established that Stewart fixed bids with VandeBrake for the Sibley Airport patching project. The crucial point for this determination is the fact that Great Lakes was not in a position to supply M4 concrete mix to the project. As a consequence, there was simply no reason for Stewart to consider bidding on the project. Great Lakes has no concrete plant in Sibley. Its closest plant is located in Ocheyedan, approximately 35 minutes from the Sibley Airport, while GCC has a concrete plant in Sibley. As a result, Great Lakes was not in a position to meet the state regulations requiring that the pouring of the M4 concrete mix for the project be completed within one hour of the beginning of loading. This fact, when combined with the resulting economic dangers should the M4 concrete not be poured within the one hour window, the

load being sent back and the attendant danger that a $10,000 drum of the cement delivery truck may have to be discarded, effectively precluded Stewart from considering bidding on the project.

The court credits VandeBrake's testimony that he raised the subject of the project with Stewart, and that Stewart told him not to worry about it. However, in the court's view, this conversation was not a negotiation by Stewart to rig GCC's bid for the project, but Stewart's honest reflection that Great Lakes was not in a position to bid on the project and that, therefore, GCC had nothing to worry about from Great Lakes. VandeBrake, however, either did or should have known, based on his experience in the concrete industry, that the distance between Great Lakes's Ocheyedan concrete plant and the job site coupled with the M4 concrete mix's time sensitive delivery requirements made Stewart's bidding on the project an extremely remote possibility. Nonetheless, VandeBrake may well have believed that he was obligated to contact Stewart concerning the project before submitting GCC's bid for it and, therefore, considered their conversation as a negotiation over the project. However, Stewart, in the court's estimation did not view their conversation in the same light, since Great Lakes could not meet the project's M4 concrete mix requirements. The fact that Stewart was not in a position to bid on the Sibley Airport patching project, rendering the project of no consequence to him, further accounts for his failure to recall his conversation with VandeBrake about it. For these reasons, the court finds that the prosecution has not established that Stewart fixed bids with VandeBrake for the Sibley Airport patching project.

### ii. *East Okoboji beach project*

The parties also dispute whether Stewart and VandeBrake fixed bids for the East Okoboji beach project. The project was a large paving project in Spirit Lake, Iowa. Unlike the Sibley Airport patching project, both GCC and Great Lakes submitted bids for

the East Okoboji beach project. On January 19, 2009, Ryan Lake submitted GCC's bid for concrete for the East Okoboji beach project to Concrete Technologies. GCC bid $102 per cubic yard for C4WRC concrete mix. *See* Government Ex. J, GCC Standard Quotation and Contract Form. Also on January 19, 2009, Great Lakes submitted a bid for concrete for the East Okoboji project to each of the general contractors bidding for the project. Great Lakes bid $85 per cubic yard for C4WRC concrete mix. *See* Government Ex. M, Great Lakes Standard Quote and Contract Form. Great Lakes won the bid for the project.

Stewart admitted that VandeBrake contacted him regarding the project, but testified that he had no agreement with VandeBrake for the project. Stewart testified that VandeBrake inquired whether Stewart was interested in a possible joint venture on the project. Stewart was uninterested in a joint venture with GCC on the project because GCC would have had to service the project from its Lake Park, Iowa, plant, which was approximately 13 miles farther away from the project site than Great Lakes's closest plant, which was in Spirit Lake, Iowa. Stewart's chief concern in bidding on the project was not GCC, but the fact he was going to be bidding against portable concrete plants.[14] Three of the general contractors bidding on the East Okoboji beach project had their own portable concrete plants. As a result, Stewart directly contacted the contractors with the portable

---

[14] Portable concrete plants are portable ready-mix plants that large contractors bring to a work site to supply concrete needed for a project. In saying that he was "bidding against portable plants," Stewart was attempting to bid low enough for one of two things to occur: if a general contractor owned a portable plant, the contractor would opt to not bring its portable plant to the work site but instead use concrete supplied by Great Lakes, or, if a general contractor did not have a portable plant, to be able to use Great Lakes's concrete price to bid competitively for the project against those contractors who had their own portable plant.

plants and asked, "What would it take for a price to keep your Portable Plant at home?" Government Ex. C, Transcript of Stewart's Sworn Statement at 99. From the contractors' responses, Stewart calculated that his price would have to be $85.00 per cubic yard, which was the price that Great Lakes ultimately bid on the project. After VandeBrake's joint venture overture was rebuffed, Stewart testified that VandeBrake then asked him what he should bid on the project. In response, Stewart testified that he told VandeBrake, "Bid whatever you want. I'm bidding against portable plants. I'm bidding low." Sentencing Tr., Vol. 1 at 149 (docket no. 62 in *United States v. Stewart*, CR10-4028-MWB). Stewart testified that he was willing to bid the project on a very small margin of profit in order to keep his plant busy and keep the portable plants out.

The prosecution disputes Stewart's assertion that he did not fix bids with VandeBrake for the East Okoboji beach project and directs the court's attention to the testimony of VandeBrake. VandeBrake testified that, after he was contacted by some contractors asking him to price concrete for the project, he called Stewart to ask him what he should bid. VandeBrake testified that in response to his question, Stewart told him "to be high." Sentencing Tr., Vol. 1 at 200. He also testified that he believed that by bidding high he was in compliance with his agreement with Stewart. The prosecution also points to Lake's testimony that VandeBrake gave him the price to bid on the project and that the price GCC ultimately bid was "a little higher than we talked about at first, but I just took it as, you know, we don't really — can't really get there with it." Sentencing Tr., Vol. 1 at 279. Finally, the prosecution directs the court to the testimony of FBI Special Agent Jon Moeller. Special Agent Moeller testified that during Stewart's initial interview with law enforcement he admitted that he had rigged eight to twelve bids and was then "asked to recall what he could about those projects." Sentencing Tr., Vol. 2 at 128 (docket no.

63 in *United States v. Stewart*, CR10-4028-MWB).  Special Agent Moeller testified that, in response to that question, Stewart mentioned the East Okoboji beach project.[15]

The court credits Stewart's testimony regarding the East Okoboji beach project and concludes that the prosecution has not established that Stewart fixed bids with VandeBrake for that project.  The essential fact driving this finding is that Great Lakes's competition

---

[15] Special Agent Moeller testified in pertinent part:

> Q.  How many projects did Mr. Stewart admit that he had rigged in his initial interview with you?
>
> A.  Eight to ten to twelve was the quote.
>
> Q.  And was East Okoboji Beach one of the projects he mentioned in response to that question?
>
> A.  Yes.
>
> Q.  And what did you say he said about that project?
>
> A.  He said he had spoken to Steve VandeBrake about that job and that it went to CTI.
>
> Q.  Now, did he speak again on August 16, 2010, in that interview about that project?
>
> A.  Yes, he did.
>
> Q.  And what did he tell you at that time?
>
> A.  He said that Steve VandeBrake had called him and stated not to worry about GCC on the job and that GCC was not a factor in this job.
>
> Q.  Did he say anything about giving Steve a price?
>
> A.  He stated that there – he could not recall any further conversation.
>
> Q.  On page 1 and 2 of that August 16 interview, do you see anything about whether –
>
> A.  Well, VandeBrake – Steve also asked him where he was going to be at on it, and he said that he did not receive a price from Steve.

Sentencing Tr., Vol. 2 at 128-29.

for the East Okoboji beach project was not GCC, but the three contractors with portable concrete plants. Thus, there was no motive for Stewart to rig bids for the project with GCC. Indeed, VandeBrake admitted in his testimony that he and Lake discussed whether GCC could service the project, and the two concluded that GCC could not service the project. Their assessment presumably was based on the fact that its closest plant was too far away to make the project serviceable. Stewart's pricing for the project was not based on his discussion with VandeBrake but, instead, on the responses he got from the three contractors to his question, "What would it take for a price to keep your Portable Plant at home?" Stewart's $85 per cubic yard bid was substantially below the prices for other projects in the area, which supports Stewart's testimony that he told VandeBrake to "[b]id whatever you want. I'm bidding against portable plants. I'm bidding low." Sentencing Tr., Vol. 1 at 149.

The court has chosen not to credit VandeBrake's testimony to the contrary on the East Okoboji beach project. The court finds it significant that, when VandeBrake was asked whether he had called Stewart to inquire about a joint venture, he initially stated, "I don't remember." Sentencing Tr., Vol. 1 at 62. Then, after testifying that he believed Stewart was lying when Stewart testified that VandeBrake had called Stewart to inquire about a joint venture, VandeBrake testified, "I don't remember the specifics of the conversation." Sentencing Tr., Vol. 1 at 62 (docket no. 62). The lack of detail in Special Agent Moeller's testimony, concerning Stewart's "admission" that he had rigged bids for the East Okoboji beach project, leads the court to substantially discount its probative value

on this issue.[16] The court finds that the prosecution has not established that Stewart fixed bids with VandeBrake for the East Okoboji beach project.

### iii. *Spencer Lincoln School project*

Finally, the parties further dispute whether Stewart and VandeBrake fixed bids for the Spencer Lincoln School project. Stewart contends that he did not fix bids for the Spencer Lincoln School project. Specifically, Stewart asserts that he never submitted a bid for this project and did not need to do so. Stewart asserts that this was because Barry DeLoss, a concrete contractor in Spencer, Iowa, and a long-time customer of Great Lakes, was bidding on the project and Great Lakes had previously provided DeLoss with a fixed price for concrete for the year.[17] In support of his position, Stewart points out that the no bid sheet or other record for the Spencer Lincoln School project was found in Great Lakes's records. He also puts forward DeLoss's affidavit in which DeLoss avows that he did not request or receive a bid from Great Lakes for the project but, instead, relied on a guaranteed set price he had previously received from Great Lakes for the purchase Spencer

---

[16]The court notes that, unlike Stewart's September 8, 2010, statement, which was taken down by a court reporter and transcribed, Stewart's initial statement on November 18, 2009, was not recorded. As a result, the court cannot ascertain with any certainty the context of Stewart's statement which Special Moeller took to be an admission. Significantly, no similar "admission" appears in Stewart's September 8, 2010, statement.

[17]There is a conflict in the evidence as to the fixed price for concrete DeLoss was given by Great Lakes. Stewart testified that DeLoss had a set price with Great Lakes to purchase Spencer paving mix for $98 per cubic yard. Sentencing Tr., Vol. 1 at 73. DeLoss, however, avers in his affidavit that his fixed price was $100 per cubic yard for Spencer paving mix. Defendant's Ex. 18 at ¶¶ 4,6. "Spencer paving mix" is a special concrete mix required by the City of Spencer, Iowa.

paving mix.[18] It is uncontested that, on June 2, 2009, Ryan Lake submitted GCC's bid for concrete for the Spencer Lincoln School project to Jensen Builders. GCC bid $103 per cubic yard for Spencer paving mix and $113 per cubic yard M4 concrete mix. *See* Government Ex. L, GCC Standard Quotation and Contract Form. It is further uncontested that DeLoss was the successful bidder for the Spencer Lincoln School project and DeLoss obtained its concrete for the project from Great Lakes.

The prosecution challenges Stewart's assertion that he did not fix bids for the Spencer Lincoln School project. The prosecution, however, concedes that this project is a "closer" question than presented by the other projects. This concession undoubtedly follows from the fact that the prosecution has been unable to locate any record of a bid by Great Lakes for the Spencer Lincoln School project. Nonetheless, the prosecution soldiers on, pointing to prior statements by Stewart, as well as testimony of Lake, Special Agent Moeller, and Kent Byers, a special agent for the United States Department of Transportation.

The court finds Stewart's testimony regarding the Spencer Lincoln School project credible and concludes that the prosecution has not established that Stewart fixed bids with

---

[18] Specifically, DeLoss avers, in pertinent part, that:

> 6. I did not request or receive a bid from Great Lakes Concrete or Spencer Ready Mix on either of [sic] this project, but relied on my guaranteed and agreed upon price of $100.00 per yard in placing my bids on this project. I am not sure when I received the $100.00 price, but it was not in the form of a bid. I am just uncertain as to the date when my annual price for this type of concrete was agreed upon per cubic yard.

Defendant's Ex. 18 at ¶ 6.

VandeBrake for the Spencer Lincoln School project. The central fact, here, is that the prosecution has not been able to locate a Great Lakes's bid sheet for the project. Moreover, its absence is explained by Stewart's testimony that he never needed to submit a bid for this project because DeLoss was bidding on the project using a fixed price for concrete for the year previously given to him by Great Lakes. Stewart's testimony, in turn, is buttressed by DeLoss's affidavit. The prosecution's evidence to the contrary falls short. First, the prosecution points to Stewart's testimony in which he concedes that he and VandeBrake had an agreement to provide similar prices for bids on projects in Spencer. This agreement was because both Great Lakes and GCC have concrete plants in Spencer, Iowa. Stewart, however, explicitly testified that the Spencer Lincoln School project was not subject to that agreement because DeLoss won the bid for that project. The second arrow in the prosecution's quiver is the supposed acknowledgment by Stewart, in his September 8, 2010, statement, that it was "possible" that he provided a $5 per cubic yard discount for on-time payment for a "quote" on the Spencer Lincoln School project. See Government Ex. C at 92. The significance of this supposed admission is that it explains the difference between the $98 bid price used by DeLoss and GCC's $103 bid price. The court finds Stewart's statement unpersuasive, because Stewart's answer comes in response to a vague question posed to him regarding "this particular project?" The question is problematic because it does not specifically identify the project being asked about and comes after a discussion of three Spencer projects. Moreover, even if Stewart understood the question posited to be about the Spencer Lincoln School project, Stewart's response that it was "possible" is hardly authoritative. Other evidence on this issue suffers from similar vagaries. Special Agent Byers testified that Stewart indicated that, if GCC and Great Lakes's prices for the Spencer Lincoln School project were, "the same that it would have been likely they would have talked." Sentencing Tr., Vol. 2 at 437. The

value of this testimony is diminished by the fact that DeLoss's bid price for the project was not the same as GCC's, but lower. Special Agent Moeller testified that Stewart conceded in his first interview that he "might have spoken with Steve about a project involving DeLoss." Sentencing Tr., Vol. 2 at 463. The value of Special Agent Moeller's testimony is lessened by the fact that the specific project referred to is not identified as well as Stewart's equivocal answer. Finally, the prosecution relies on Lake's testimony that VandeBrake gave him the price to bid on the Spencer Lincoln School project and his price was supposed to be the same as Great Lakes. Lake's testimony, however, does not establish that Stewart and VandeBrake ever discussed fixing their respective bids for the Spencer Lincoln School project. Therefore, the court finds that the prosecution has not established that Stewart fixed bids with VandeBrake for the Spencer Lincoln School project.

### d. Price-fixing—price sheets

The parties also disagree whether Stewart entered into an agreement with VandeBrake to fix prices for ready-mix concrete in their companies' 2009 price sheets. Stewart's position is that, while he may have had a conversation with VandeBrake regarding 2009 price sheets and his company's prices for concrete, he never came to an agreement with VandeBrake to fix prices in their companies' 2009 price sheets. The prosecution challenges Stewart's assertion, arguing that Stewart's story is contradicted by not only VandeBrake's statements but by Stewart's own previous statements as well as strong circumstantial evidence supporting VandeBrake's account.

The court finds that the prosecution has established that Stewart's discussions with VandeBrake over 2009 price lists constituted an agreement between the two to fix prices in their companies' 2009 price sheets. First, Stewart admitted in his testimony to having one discussion with VandeBrake regarding their companies' 2009 price lists. Stewart,

however, insisted during his testimony that all that happened during his one discussion with VandeBrake about the 2009 price sheets is that Stewart told him he "was probably going up because prices are going up." Sentencing Tr., Vol. 1 at 136. Stewart also testified that when he issued Great Lakes's 2009 price list in April of 2009, GCC's 2009 price list had been out since January 2009.[19] Although Stewart denied actually seeing GCC's 2009 price list, he testified that he had heard through the grapevine approximately what GCC's prices were for 2009, and was able to use that information in formulating Great Lakes's 2009 price list. However, this was not the same story Stewart told to the prosecution just three months before, during his September 8, 2010, debriefing. On that occasion, Stewart stated that he believed he had issued Great Lakes's 2009 price list before GCC issued its 2009 price list and VandeBrake must have copied his price list. Stewart also stated during his September 8, 2010, debriefing that he had "no idea" where GCC was likely to be on its 2009 price list when he developed Great Lakes's 2009 price list. *See* Gov't Ex. C. at 105-06. Stewart was forced to concede at the sentencing hearing that GCC's price list came out first and that he did know about GCC's 2009 prices when he issued Great Lakes's 2009 price list.[20]

---

[19]While Stewart claims that Great Lakes's 2009 price list did not come out until April of 2009, its 2009 price list clearly states that it became "effective" on "January 1, 2009." *See* Gov't Ex. E. Yet, Great Lakes's 2008 price list shows an "effective" date of March 1, 2008. Stewart's testimony does not explain this anomaly.

[20]Stewart's testimony on this point was as follows:

> Q.    Now, what's your explanation for how it came about that the prices that Great Lakes has on its price sheet and the prices that GCC has on its price sheet are identical?

(continued...)

Stewart's testimony at the sentencing hearing was directly contradicted by VandeBrake's testimony. VandeBrake testified that late in 2008, he had a meeting with Peter Brewin, his boss at GCC, before GCC's 2009 prices for concrete were set. At this meeting, Brewin told VandeBrake that CEMEX, a large ready-mix company with operations across the United States, was coming out with a $25 per cubic yard increase in its concrete prices. Brewin asked VandeBrake whether GCC could command a $25 per

---

[20] (…continued)

| | |
|---|---|
| A. | Their prices have been out since January. Mine didn't come out till April, and the word on the street – I'm from a small farming community – was the prices had gone up accordingly to that, in that vicinity. |
| Q. | So is it your testimony now that you took their publicly available prices into account when you came up with your price sheet? |
| A. | I never saw their sheets, but people that I know – it's a small community – who told me that they were up there in the upper $90 range. |
| Q. | Now, in your prior interview in September 2010, you were asked the same question, and I believe your answer was you – your recollection or your belief was that Mr. Steve VandeBrake was the one who copied your price sheet. Do remember that? |
| A. | Yes, I remember that. |
| Q. | Is that answer still true, or do you wish to take back that answer? |
| A. | No, their prices came out way before ours, and I did know about them. |
| Q. | So you take back your prior statement that Mr. Steve VandeBrake must have copied your price sheet and that's why they're the same? |
| A. | Yes. |

Sentencing Tr., Vol. 1 at 134-35.

cubic yard increase in its concrete prices in Iowa. In response, VandeBrake told Brewin absolutely not given the economic conditions which were being forecast. VandeBrake testified that Brewin then asked VandeBrake what amount of increase in concrete prices GCC could obtain. VandeBrake told Brewin that a $10 per cubic yard increase was possible for "standard mixes", the 3000, 3500, and 4000 pound concrete mixes. After his discussion with Brewin, VandeBrake testified that he talked to Ryan Lake, who was then a salesperson at GCC, about the $10 per cubic yard increase that VandeBrake had proposed. VandeBrake further testified that he contacted both Stewart and Chad Van Zee, President of Tri-State, another concrete competitor of GCC, about GCC's plan to increase its concrete prices. He did so because he was concerned about the size of GCC's price increase and wanted to be sure that GCC's competitors would go along with a price increase of that size. It is implausible that VandeBrake would fix prices with Van Zee for 2009 and not do the same with Stewart.

VandeBrake testified that it was his understanding, following his conversation with Stewart, that they had an agreement "to go up and be at the same price in '09." Sentencing Tr., Vol. 1 at 234. VandeBrake also testified that his agreement with Stewart did not require Stewart to increase his prices for standard mixes by the entire $10.00. As VandeBrake explained: "I said $10 a yard, but if our basic sheet going out is the same and he only went up whatever he went up to equal that $10 I went up, then I'm fine with that." Sentencing Tr., Vol. 1 at 235. This is precisely what occurred.

In 2009, Great Lakes and GCC's respective price lists contained identical prices for 3000, 3500, and 4000 pound concrete mixes of $95, $97, and $99 per cubic yard.[21]

---

[21]GCC maintained a separate price list for its Sergeant Bluff, Iowa, facility. *See* Gov't Ex. D. GCC's 2009 prices for its 3000, 3500, and 4000 pound concrete mixes at
(continued...)

*Compare* Gov't Ex. D *with* Gov't Ex. E. However, in 2008, GCC's price list for 3000, 3500, and 4000 pound concrete mixes were $85, $87, and $89 per cubic yard while Great Lakes's price list for 2008 shows that its prices for 3000, 3500, and 4000 pound concrete mixes were $88, $90, and $92. *Compare* Stewart Ex. 2 *with* Stewart Ex. 3. Thus, Stewart increased Great Lakes's 2009 prices for standard mixes precisely enough to match VandeBrake's $10 per cubic yard increase for GCC's standard mixes. The court finds Stewart's claim that he was able to precisely match GCC's 2009 prices for standard mixes across the board despite, as he claimed in his testimony, never actually seeing GCC's 2009 price list or discussing GCC's 2009 prices with VandeBrake to not be credible. Moreover, VandeBrake's testimony was confirmed in part by Lake's testimony. Lake testified that, after VandeBrake told him about GCC's $10 per cubic yard increase for 2009, Lake expressed his concern that contractors were not going to like the price increase and asked VandeBrake if the competition was also going up. Lake reported that VandeBrake replied that, "He believed that they were going to be at the same price." Sentencing Tr., Vol. 1 at 283. Therefore, the court finds that the prosecution has met its burden of establishing that Stewart made an agreement with VandeBrake to fix prices for their companies' standard concrete mixes through matching 2009 price sheets. The court finds that the volume of Great Lakes's commerce affected by the price-fixing of price sheets is $925,540.[22]

---

[21](...continued)
its Sergeant Bluff operation were $8 to $10 less than at its other concrete operations. Notably, Great Lakes has no concrete operation which competes with GCC's Sergeant Bluff facility.

[22]The court has attributed to Stewart the volume of commerce resulting from all standard-mix concrete sales of Great Lakes in its relevant area. The court rejects Stewart's
(continued...)

## C. Defendant's Personal Characteristics

### 1.    Defendant VandeBrake

The following description of VandeBrake's personal characteristics is drawn from his PSIR. At the time of his sentencing, VandeBrake was 44 years old. He was adopted at birth by Norlyn and Sandy (nee: Schutt) VandeBrake. His father is retired from the concrete industry. He has a close relationship with his parents. VandeBrake reported he had a "normal" childhood which was free of any abuse. Except for residing in Missouri from 1985 to 1986, and Arizona in 1987, while attending college, VandeBrake has resided in Orange City, Iowa, his entire life. VandeBrake has one sister, Gail (nee: VandeBrake) Dorn, age 39, who resides in Orange City, Iowa. He has daily contact with his sister.

VandeBrake currently resides in a home that he and his wife have $822,106 of equity in. In addition, he owns two other residences, with $519,600 in equity in one and $267,300 in equity in the other. VandeBrake married his wife, Mary (nee: Hickerson) VandeBrake, age 42, in 1994. She is a homemaker. They have three daughters, ages 13, 9, and 7. VandeBrake is very close to his children.

---

[22](…continued)

argument that the court should include only undiscounted standard-mix concrete sales. This is because the final price for all of Great Lakes's standard-mix concrete sales began with the sheet price of the concrete since the sheet price formed the baseline from which all discounted prices were determined. Thus, even though many Great Lakes's customers were accorded discounts in their purchases of Great Lakes's standard-mix concrete, the discounted price was always calculated by subtracting the customer's particular discount from Great Lakes's 2009 sheet price for the standard-mix concrete. Thus, each Great Lakes's sale of standard-mix concrete was "affected" by the price-fixing of Great Lakes's 2009 price sheets. *See United States v. SKW Metals & Alloys*, 195 F.3d 83, 90 (2d Cir. 1999) ("While a price-fixing conspiracy is operating and has *any* influence on sales, it is reasonable to conclude that all sales made by defendants during that period are "affected" by the conspiracy.").

Vandebrake graduated from MOC-Floyd Valley Community School in 1985. He attended Central Missouri State in Warrensburg, Missouri, for three semesters from 1985 to 1986. He attended Sedalia Community College in Sedalia, Missouri, for one semester in 1986. He also attended Phoenix Community College in Phoenix, Arizona, for one semester in 1987. In college, VandeBrake pursued, but did not achieve, a degree in marketing.

VandeBrake has been employed in the concrete industry since 1988. His grandfather started Russell's Ready Mix in Orange City, Iowa, in 1954. The company was passed down to VandeBrake's father, and in 1994, VandeBrake took over operation of the company when his father gave him the business. There is no information in the PSIR that VandeBrake has held a job other than in the family business. In January 2006, the company became Alliance Concrete, with VandeBrake owning one-half of that company. In January 2008, Grupo Cementos de Chihuahua bought Alliance, with the newly formed company being GCC. VandeBrake had no ownership interest in GCC but was retained as the company's sales manager. VandeBrake resigned his position with GCC in August 2009 after the execution of a federal search warrant at GCC. At the time, he was earning a salary of $120,000 per year. VandeBrake has been unemployed since August 2009, but has been receiving income from his investments.

VandeBrake has submitted a Personal Financial Statement in which he reports total assets of $10,416,772, including $6,256,581 in a joint investment account, $1,258,000 in an investment L.L.C., equity in three residences worth $1,609,006, $500,000 in an S corporation, and two Cadillac Escalades, among other vehicles, valued at $120,000; total liabilities of $183,000; a net worth of $10,233,682; a total monthly income of $32,000, all of which is investment income; total monthly expenses of $13,512, $3,000 of which is for clothing; and a net monthly investment income of $18,488. Given his financial

resources, the court finds that VandeBrake has a substantial net worth and the ability to pay a substantial financial penalty.

The wealthy white-collar criminal defendants who have previously appeared before the court for sentencing have typically been able to point to some involvement or contribution they make to their community. This is not the case with VandeBrake. Although VandeBrake is extremely wealthy, there is no evidence in the record that VandeBrake is, or has been, involved in any civic organizations, makes, or has made, any charitable contributions or does, or has performed, any charitable work, or is otherwise involved, or has been involved, in any community service activities.

VandeBrake admits to social drinking since he was seventeen, but denies any illicit use of controlled substances. He reported that he is presently in good health, and reported no history of serious illness or surgery. He takes Allopurinol for his joints, Paroxetine for seasonal depression, and Propecia. The court does not find that any aspect of VandeBrake's physical condition is significant for sentencing purposes.

VandeBrake's criminal history is minimal, consisting of an "Operating While Intoxicated" conviction from 1986.[23] As a result, he was assessed no criminal history points in the guidelines sentencing calculation summarized below.

### 2. Defendant Stewart

Stewart's PSIR reveals the following personal characteristics. Stewart was 51 years old at the time of his sentencing. He was born and raised in Iowa. He has lived in Iowa his entire life except for two years, 1979 to 1981, when he lived in Minneapolis, Minnesota. Stewart currently resides in Spirit Lake, Iowa. His father, Ken Stewart, died

---

[23]VandeBrake does have three pending charges for "Operating While Intoxicated," "Operating Without Headlights," and "Drive Left of Center." These charges are all from January 30, 2010.

in 1999 after being hit by a gravel truck. His mother, Audrey Stewart (nee: Wilken), age 80, resides in Rock Rapids, Iowa. Stewart reported he had a "very good" childhood which was free of any type of abuse. He has weekly contact with his mother.

Stewart has three siblings: two brothers, Mark Stewart, age 58, who resides in Rock Rapids, Iowa, and is president of a construction company, and Grant Stewart, age 56, who also resides in Rock Rapids, Iowa, and is employed in the construction industry; and a sister, Rebecca (nee: Stewart) Hedges, age 55, who resides in Sioux Falls, South Dakota, and is a homemaker. Stewart has a good relationship with his siblings.

Stewart married Marie Stewart, age 48, in 1987. Marie had two children from a previous relationship: a son, age 29, and a daughter, age 27, both of whom reside in Lake Park, Iowa. Although Stewart never adopted Marie's children, he advised that he has "raised them as [his] own." Stewart and Marie have one child together, a daughter, age 21. She resides in Orlando, Florida, and is attending college. Stewart has four grandchildren. He maintains regular contact with his children and grandchildren.

Stewart graduated from Central Lyon High School in Rock Rapids, Iowa in 1977. In 1981, he received an Associate's Degree from the Dunwoody Institute, in Minneapolis, Minnesota. Stewart has been employed in the concrete industry since 1982. Since 2004, he has been President and General Manager of Great Lakes in Ocheyedan, Iowa. Presently, he earns $670,224 a year in salary and profits from Great Lakes.

On his Personal Financial Statement, Stewart reports total assets of $4,116,858, including his one-third ownership interest in Great Lake, valued at $2,512,980, equity in three farms worth $806,400, $420,978 in stocks, savings, investment and retirement accounts, and $200,000 in equity in his personal residence; total liabilities of $177,155; a net worth of $3,939,703; a total monthly income of $56,999; total monthly expenses of

$1,415; and a net monthly income of $56,384. Thus, given his financial resources and appreciable net worth, Stewart has the ability to pay a substantial financial penalty.

Stewart, unlike VandeBrake, does not have ostentatious spending habits or an extravagant life style. For example, VandeBrake's financial statement lists over $74,000 in jewelry and watches while Stewart lists but $1,500 in jewelry. Stewart lives in a modest, unassuming house and drives a late model pickup truck as his company vehicle. His small office, containing a plain, functional desk, a pair of chairs, a file cabinet and some cupboards, is located in a boxy, nondescript post frame building located immediately adjacent to Great Lakes's Ocheyedan concrete plant. *See* Stewart Ex. 28.

Stewart reports that he has drunk alcohol socially since he was eighteen, but does not believe he has an alcohol problem. He admits to using marijuana once, when he was fifteen. He has never been evaluated or treated for a substance abuse problem. He reported that he is presently in good health, with no history of serious illness or surgery. He currently takes Lipitor and Tricor for high cholesterol. No aspect of Stewart's physical condition is significant for sentencing purposes.

Stewart has a negligible criminal history, his only conviction being for consumption of alcohol in a public place from 2008.[24] As a result, he was assessed no criminal history points in the guidelines sentencing calculation summarized below.

---

[24]Although Stewart indicated that he was arrested in 1977 and 1983 for driving while intoxicated, records for these arrests are no longer available and the disposition of these offenses are unknown.

## II. LEGAL ANALYSIS

### A. Breach Of The Plea Agreement In Stewart's Case

Stewart and the prosecution each accuse the other of breaching their plea agreement. The plea agreement between Stewart and the prosecution does not bind the court.[25] FED. R. CRIM. P. 11(c)(1)(B); *see United States v. Norris,* 486 F.3d 1045, 1047 n. 1 (8th Cir. 2007) (en banc) (plurality opinion) ("The plea agreement was made in accordance with Fed. R. Crim. P. 11(c)(1)(B), under which a sentencing 'recommendation or request does not bind the court.'"). When accepting the guilty plea, Stewart was advised, as required by Fed. R. Crim. P. 11(c)(3)(B), that the court was not bound by the plea agreement. *See United States v. Martinez-Noriega,* 418 F.3d 809, 811 (8th Cir. 2005) (noting that a Rule 11(c)(1)(B) plea agreement does not bind the district court). Nevertheless, when a guilty plea is induced by an agreement, the prosecution must abide by its terms. *See United States v. Yellow*, 627 F.3d 706, 708-09 (8th Cir. 2010); *United States v. Lovelace,* 565 F.3d 1080, 1087 (8th Cir. 2009); *United States v. E. V.,* 500 F.3d 747, 754 (8th Cir. 2007); *Mosley,* 505 F.3d at 808-09; *United States v. Granados,* 168 F.3d 343, 345-46 (8th Cir. 1999) (*per curiam*). As the Eighth Circuit Court of Appeals recently explained:

> "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York,* 404 U.S. 257, 262, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971). "Allowing the government to breach a promise that induced a guilty plea violates due process" and undermines the "honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of

---

[25] As the court mentioned at the sentencing hearing, the court is giving Stewart's plea agreement virtually no weight.

government." *Thompson,* 403 F.3d at 1039 (internal quotation and citations omitted). "The party asserting the breach . . . has the burden of establishing a breach ." *United States v. Smith,* 429 F.3d 620, 630 (6th Cir. 2005).

*Yellow*, 627 F.3d at 708-09.

### 1.    The applicable two-step analysis

This court has previously explained that, when confronted with a defendant's allegation that the prosecutor has breached a plea agreement, the court engages in a two-step process: The court must first determine whether or not there has been a breach of the plea agreement, and if there has been a breach, then determine the proper remedy. *United States v. Discus*, 579 F. Supp.2d 1142, 1151 (N.D. Iowa 2008) (citing *United States v. E. V.* 500 F.3d at 751 & 754, and *United States v. Mosley,* 505 F.3d 804, 809-12 (8th Cir. 2007); *accord United States v. Callanan,* 582 F. Supp. 2d 1125, 1132-33 (N.D. Iowa 2008). Thus, before this court can proceed any further with its determination of Stewart's sentence, the court must first decide whether or not his plea agreement was, in fact, breached by the prosecution.[26]

### 2.    Determination of the breach

"'A plea agreement is essentially a contract between the government and the defendant.'" *United States v. Birbragher*, 603 F.3d 478, 490 (8th Cir. 2010) (quoting

---

[26]If the court finds that the prosecution breached the plea agreement, the undersigned will have no choice but recusal pursuant to *Santobello v. New York,* 404 U.S. 257, 262-63 (1971), as construed by the Eighth Circuit Court of Appeals in *United States v. McCray,* 849 F.2d 304, 3005-06 (8th Cir. 1988), leaving Stewart's sentencing to another judge in this district. *See United States v. Mosley,* 505 F.3d 804, 809-12 (8th Cir. 2007); *United States v. Thompson,* 403 F.3d 1037, 1041 (8th Cir. 2005); *United States v. DeWitt,* 366 F.3d 667, 671 (8th Cir. 2004); *United States v. Van Horn,* 976 F.2d 1180, 1183-84 (8th Cir. 1992); *Brunelle v. United States,* 864 F.2d 64, 65 (8th Cir. 1988).

*United States v. Sisco*, 576 F.3d 791, 795 (8th Cir. 2009)); *accord United States v. Andis*, 333 F.3d 886, 890 (8th Cir. 2003). Accordingly, "'[p]lea agreements are contractual in nature and should be interpreted according to general contractual principles.'" *Yellow*, 627 F.3d at 708 (quoting *United States v. Thompson,* 403 F.3d 1037, 1039 (8th Cir. 2005)); *see United States v. Nguyen*, 608 F.3d 368, 373 (8th Cir. 2010) (observing that "[p]lea agreements are interpreted as contracts. . ."); *Mosley,* 505 F.3d at 808 (noting that courts "'interpret the meaning of the terms in the agreement according to basic principles of contract law.'") (quoting *United States v. Norris*, 486 F.3d 1045, 1051 (8th Cir. 2007)). Any ambiguities in a plea agreement are construed against the prosecution. *See Nguyen*, 608 F.3d at 373; *see also United States v. Stobaugh,* 420 F.3d 796, 800 (8th Cir. 2005); *Andis,* 333 F.3d at 890; *Margalli-Olvera,* 43 F.3d at 353.

Paragraph 17 of the plea agreement contains the critical language in this controversy. It states, in part, that:

> The defendant agrees that, should the United States determine in good faith, during the period that any Federal Proceeding is pending, that the defendant has failed to provide full and truthful cooperation, as described in Paragraph 12 of this Plea agreement, or has otherwise violated any provision of this Plea Agreement, the United States will notify the defendant or his counsel in writing by personal or overnight delivery or facsimile transmission and may also notify his counsel by telephone of its intention to void any of its obligations under this Plea Agreement (except its obligations under this paragraph), and the defendant shall be subject to prosecution for any federal crime which the United States has knowledge including, but not limited to, the substantive offenses relating to the investigation resulting in this Plea Agreement.

Stewart Plea Agreement at ¶ 17 (docket no. 11 in CR10-4028-MWB).[27]

---

[27]Paragraph 12 of the plea agreement states:

### DEFENDANT'S COOPERATION

12.    The defendant will cooperate fully and truthfully with the United States in the prosecution of this case, the conduct of the current federal investigation of violations of federal antitrust and related criminal laws involving the manufacture or sale of ready-mix concrete in the state of Iowa, any other federal investigation resulting therefrom, and any litigation or other proceedings arising or resulting from any such investigation to which the United States is a party ("Federal Proceeding").   The ongoing, full, and truthful cooperation of the defendant shall include, but not be limited to:

(a)    producing all non-privileged documents, including claimed personal documents, and other materials, wherever located, in the possession, custody, or control of the defendant, requested by attorneys and agents of the United States.

(b)    making himself available for interviews in the Northern District of Iowa, not at the expense of the United States, upon the request of attorneys and agents of the United States;

(c)    responding fully and truthfully to all inquiries of the United States in connection with any Federal Proceeding, without falsely implicating any person or intentionally withholding any information, subject to the penalties of making false statements (18 U.S.C. § 1001) and obstruction of justice (18 U.S.C. § 1503, *et seq.*);

(d)    otherwise voluntarily providing the United States with any non-privileged material or information, not requested in (a)-(c) of this paragraph, that he may

(continued…)

The prosecution argues that it was justified in voiding its obligations under the plea agreement with Stewart when he failed to provide full and truthful cooperation. Specifically, the prosecution points, *inter alia*, to Stewart's response to the prosecution's offense conduct statement, in which Stewart argued that volume of commerce affected by his actions did not exceed $250,000, as well as his denial of his involvement in bid rigging on the disputed Sibley Airport, East Okoboji, and Spencer Lincoln School projects, and his retracting his prior statements concerning the approximate starting date of the conspiracy. In response, Stewart contends that he honestly and fully cooperated with the prosecution since his initial proffer statement in Chicago on January 13, 2010. Stewart asserts that the prosecution knew of each of the disputed projects and had a full and fair opportunity to question Stewart about those projects before the plea agreement was executed. The prosecution counters that its belief that Stewart was not providing full and truthful cooperation with its investigation was based on more than just his denial of his involvement in the disputed projects, but also its dissatisfaction with Stewart's stepping

---

[27](...continued)

> have that is related to any Federal Proceeding; and
>
> (e)     when called upon to do so by the United States in connection with any Federal Proceeding, testifying in grand jury, trial, and other judicial proceedings, fully, truthfully, and under oath, subject to the penalties of perjury (18 U.S.C. § 1621), making false statements or declarations in grand jury or court proceedings (18 U.S.C. § 1623), contempt (18 U.S.C. §§ 401-402), and obstruction of justice (18 U.S.C. § 1503 *et seq.*).

Stewart Plea Agreement at ¶ 12 (docket no. 11 in CR10-4028-MWB).

back from prior statements he had made, including his statements concerning both the date and the nature of his original agreement with VandeBrake.

In this case, the terms of Stewart's plea agreement with the prosecution leave no doubt that the prosecution has sole discretion to evaluate whether Stewart had provided full and truthful cooperation, with that discretion limited only by the requirement that it be exercised in good faith. "To meet its obligation of good faith, the [prosecution] need only demonstrate honest dissatisfaction with the defendant's efforts." *United States v. Reeves*, 296 F.3d 113, 116 (2nd Cir. 2002); *accord United States v. Roe*, 445 F.3d 202, 207 (2nd Cir. 2006) (quoting *Reeves*, 296 F.3d at 116).

The court finds that the prosecution was honestly dissatisfied with Stewart's cooperation. The prosecution could reasonably have believed VandeBrake's admissions that he and Stewart rigged bids on the three disputed projects. This fact, when coupled with the prosecution's view that Stewart had himself admitted during his August 16, 2010, debrief that he had rigged bids with VandeBrake on the East Okoboji project, provided a basis for the prosecution to reasonably believe that Stewart was playing fast and loose with the facts and not providing full and truthful cooperation with its investigation. Stewart has failed to demonstrate that the prosecution acted in bad faith in its determination to void its obligations under the plea agreement based on its conclusion that he was not providing full and truthful cooperation. Therefore, the court finds that the prosecution did not breach its plea agreement with Stewart and the court may proceed with determining both Stewart and VandeBrake's sentences.

## B. The Methodology For Determination Of A Sentence

The Eighth Circuit Court of Appeals has repeatedly reiterated the following three-step methodology for determination of a defendant's sentence:

The first step in the sentencing process is to determine the
proper guidelines range for the defendant's sentence. *Gall v.
United States,* ---U.S. ----, 128 S. Ct. 586, 596, 169 L. Ed. 2d
445 (2007); *[United States v.] Thundershield,* 474 F.3d [503,]
506-07 [(8th Cir. 2007)].   A court should then consider
whether a departure or a variance is appropriate and apply the
factors in 18 U.S.C. § 3553(a).  *Gall,* 128 S. Ct. at 596-97;
*Thundershield,* 474 F.3d at 506-07.

*United States v. Roberson*, 517 F.3d 990, 993 (8th Cir. 2008); *see United States v.
Mireles*, 617 F.3d 1009, 1012 (8th Cir. 2010) ("In determining an appropriate sentence,
'the district court ordinarily should determine first the appropriate guideline range, then
decide if the guidelines permit a traditional departure, and finally determine whether the
§ 3553(a) factors justify a variance from this "'guidelines sentence.'"") (quoting *United
States v. Miller,* 479 F.3d 984, 986 (8th Cir. 2007)); *United States v. Rivera*, 439 F.3d
446, 447 (8th Cir. 2006) ("In *United States v. Haack,* 403 F.3d 997, 1002-03 (8th Cir.
2005), we outlined the procedure a district court is to follow in imposing a post-*Booker*
sentence.   First, the district court should determine the Guidelines sentencing range.
Second, the district court should determine whether any traditional departures are
appropriate.   Third, the district court should apply all other section 3553(a) factors in
determining whether to impose a Guidelines or non-Guidelines sentence.").  Although "a
court of appeals may apply a presumption of reasonableness when conducting substantive
review of a sentence within the advisory range, 'the sentencing court does not enjoy the
benefit of a legal presumption that the Guidelines sentence should apply.'"  *United States
v. Henson*, 550 F.3d 739, 740 (8th Cir. 2008) (quoting *Rita v. United States*, 551 U.S.
338, 351 (2007)).  The Supreme Court has emphasized this point, noting that "[o]ur cases
do not allow a sentencing court to presume that a sentence within the applicable Guidelines
range is reasonable," and that "[t]he Guidelines are not only *not mandatory* on sentencing

courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) (*per curiam*) (emphasis in the original).

As the Eighth Circuit Court of Appeals has also explained,

> Under *Gall,* we may no longer require extraordinary circumstances to justify a sentence outside the Guidelines range. *Gall,* 128 S. Ct. at 595. However, "a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Id.* at 594. If, after an "individualized assessment based on the facts presented," the district court "decides that an outside-Guidelines sentence is warranted, [the district court] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 597. It is "uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Id.* "[A]n abuse of discretion may occur when (1) a court fails to consider a relevant factor that should have received significant weight; (2) a court gives significant weight to an improper or irrelevant factor; or (3) a court considers only the appropriate factors but in weighing those factors commits a clear error of judgment." *United States v. Haack,* 403 F.3d 997, 1004 (8th Cir. 2005) (internal quotation marks and citation omitted). *See also Gall,* 128 S. Ct. at 597.

*United States v. Kane*, 552 F.3d 748, 752 (8th Cir. 2009).

### C. Policy Disagreements With Sentencing Guidelines

As to grounds for variance from a guidelines sentence, "[i]n *Kimbrough [v. United States*, 552 U.S. 85 (2007)], the Supreme Court held that it was not an abuse of discretion for a district court to vary from the Guidelines based on its policy disagreement concerning

the disparity between crack and powder cocaine sentences." *United States v. Battiest*, 553 F.3d 1132, 1137 (8th Cir. 2009) (citing *Kimbrough*, 552 U.S. at 110-111). Thus, "policy disagreements" may provide the basis for a variance from a guidelines sentence, even in a "mine-run" case. *Kimbrough*, 552U.S. at 109-110.

The Supreme Court took up the issue of the district court's authority to vary from guidelines sentences in *Spears v. United States*, 129 S. Ct. 840 (2009) (*per curiam*), which also involved the disparity between crack and powder cocaine sentences. In *Spears*, the Court explained "the point of *Kimbrough*" to be "a recognition of district courts' authority to vary from the crack cocaine Guidelines based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." *Spears*, 129 S. Ct. at 843. The Court also reiterated that it was unnecessary to consider whether variances in cases "outside the heartland" are entitled to greater respect than variances in cases "inside the heartland" and, thus, necessarily based on a policy or "categorical" disagreement with the Guidelines, where the Guidelines in question "'do not exemplify the Commission's exercise of its characteristic institutional role.'" *Id.* (quoting *Kimbrough*, 552 U.S. at 89). Furthermore, the Court clarified in *Spears* that if the sentencing court disagrees with the 100:1 ratio for crack cocaine cases, the sentencing court also necessarily has the authority to adopt some other ratio to govern a "mine-run case." *Id.* at 843-44. Specifically, the Court clarified "that district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines." *Id.* The Court found that adopting the alternative of barring such categorical variances "would likely yield one of two results":

> Either district courts would treat the Guidelines' policy embodied in the crack-to-powder ratio as mandatory, believing that they are not entitled to vary based on "categorical" policy disagreements with the Guidelines, or they would continue to

> vary, masking their categorical policy disagreements as
> "individualized determinations." The latter is institutionalized
> subterfuge. The former contradicts our holding in *Kimbrough*.
> Neither is an acceptable sentencing practice.

*Spears*, 129 S. Ct. at 844. The Court found, further, that the sentencing court had based its 20:1 replacement ratio on two well-reasoned decisions by other courts, which had, in turn, reflected the Sentencing Commission's expert judgment that a 20:1 ratio would be appropriate in a "mine-run case." *Id.*

*Spears* specifically addressed only a sentencing court's authority to reject the 100:1 crack-to-powder ratio under the guidelines, categorically, and on policy grounds, and to adopt some other ratio to govern "mine-run cases." Nevertheless, the powerful implication of *Spears* is that, in other "mine-run" situations, the sentencing court may also reject guidelines provisions on categorical, policy grounds—particularly when those guidelines provisions "'do not exemplify the Commission's exercise of its characteristic institutional role,'" *id.* (quoting *Kimbrough*, 552 U.S. at 89)—and may, consequently, adopt some other well-reasoned basis for sentencing. Indeed, a number of federal circuit courts of appeals have held that *Kimbrough* and *Spears* apply to policy disagreements with Guidelines outside of the crack cocaine context. *See United States v. Corner,* 598 F.3d 411, 415 (7th Cir. 2010) (en banc) ("We understand *Kimbrough* and *Spears* to mean that district judges are at liberty to reject *any* Guideline on policy grounds-though they must act reasonably when using that power."); *United States v. Engle,* 592 F.3d 495, 502 (4th Cir. 2010) ("[D]istrict courts may 'vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines'" (quoting *Kimbrough,* 552 U.S. at 101)); *United States v. Cavera,* 550 F.3d 180, 191 (2d Cir. 2008) (en banc) ("As the Supreme Court strongly suggested in *Kimbrough,* a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where

that disagreement applies to a wide class of offenders or offenses."); *United States v. Rodriguez*, 527 F.3d 221, 227 (1st Cir. 2008) ("*[Kimbrough]* makes plain that a sentencing court can deviate from the guidelines based on general policy considerations.").

Similarly, the Eighth Circuit Court of Appeals has recognized, in a case involving conviction on multiple child pornography counts, that a sentencing court could effectuate a life sentence under the advisory guidelines, in excess of the statutory maximum sentence of 20 years for any one count. *See United States v. Betcher*, 534 F.3d 820, 827 (8th Cir. 2008). The appellate court found that, after the sentencing court had given due consideration to the sentencing factors set out in 18 U.S.C. § 3553(a) and had recognized that the guidelines were advisory, the sentencing court had permissibly imposed *consecutive* statutory maximum sentences on all counts to ensure that the defendant served a term of lifetime imprisonment, as the Sentencing Guidelines advised. *Id.*

## D. Determination Of The Guidelines Sentence

### 1. Defendant VandeBrake

The first step in the sentencing process is to determine the proper guidelines range for the defendant's sentence. *See United States v. Lozoya*, 623 F.3d 624, 625 (8th Cir. 2010) ("In sentencing a defendant, a district court must first determine the advisory sentencing range as recommended by the Guidelines."); *see also Mireles*, 617 F.3d at 1012; *Roberson*, 517 F.3d at 993; *Rivera*, 439 F.3d at 447. The applicable Sentencing Guideline for the antitrust offenses is U.S.S.G. § 2R1.1. Section 2R1.1(a) establishes a Base Offense Level of 12 for each of the three antitrust offenses in violation of 15 U.S.C. § 1 charged against VandeBrake. Section 2R1.1(b)(1) imposes a 1 level increase in the offense level if the conduct involved participation in an agreement to submit non-

competitive bids. Section 2R1.1(b)(2) then imposes the following increases in the offense level based on volume of commerce attributable to the defendant:

| Volume of Commerce (Apply the Greatest) | | Adjustment to Offense Level |
|---|---|---|
| (A) | More than $1,000,000 | add 2 |
| (B) | More than $10,000,000 | add 4 |
| (C) | More than $40,000,000 | add 6 |
| (D) | More than $100,000,000 | add 8 |
| (E) | More than $250,000,000 | add 10 |
| (F) | More than $500,000,000 | add 12 |
| (G) | More than $1,000,000,000 | add 14 |
| (H) | More than $1,500,000,000 | add 16 |

U.S.S.G. §2R1.1(b)(2).

The court finds that VandeBrake's Base Offense Level, grouping all three charges to which he has pleaded guilty, is 12. *See* U.S.S.G. § 2R1.1.(a). He should receive a one-level increase for participating in an agreement to submit non-competitive bids. *See* U.S.S.G. § 2R1.1(b). The total volume of commerce attributable to VandeBrake is $5,666,348.61. He should further receive a two-level increase because the volume of commerce attributable to VandeBrake was more than $1,000,000 but less than $10,000,000. *See* U.S.S.G. § 2R1.1(b)(2). In addition, because VandeBrake was an organizer or leader of criminal activity that involved five or more participants, or was otherwise extensive, U.S.S.G. § 3B1.1(a) directs that VandeBrake should further receive a four-level increase. Thus, VandeBrake's Adjusted Offense Level is 19. After a three-level reduction for acceptance of responsibility, his total offense level is 16. The parties also agree, and the court finds, that VandeBrake has zero criminal history points and, thus,

he has a criminal history category of I. Consequently, his advisory guidelines sentencing range is 21 to 27 months.

### 2. *Defendant Stewart*

Like VandeBrake, the court finds Stewart's base offense level is 12. *See* U.S.S.G. § 2R1.1.(a). Stewart should receive a one-level increase for participating in an agreement to submit non-competitive bids. *See* U.S.S.G. § 2R1.1(b). He should further receive a two-level increase because the volume of commerce attributable to Stewart was more than $1,000,000 but less than $10,000,000.[28] *See* U.S.S.G. § 2R1.1(b)(2). Accordingly, Stewart's adjusted offense level is 15.

The prosecution challenges Stewart receiving a two-level reduction for acceptance of responsibility. The court, however, finds that Stewart is entitled to a two-level reduction for acceptance of responsibility because he pleaded guilty to the charged offense, was, for the most part, forthcoming in his testimony at the sentencing hearing, did not frivolously contest relevant conduct, and has not acted in a manner inconsistent with acceptance of responsibility.[29] Thus, Stewart's total offense level is 13. The court finds that Stewart has zero criminal history points and, therefore, has a criminal history category of I. Consequently, his advisory guidelines sentencing range is 12 to 18 months.

---

[28]Pursuant to Stewart's plea agreement with the prosecution, the prosecution agreed not to seek this enhancement. The court, however, is not bound by the terms of the parties' plea agreement.

[29]Nonetheless, the court recognizes that it would be well within its discretion to deny both Stewart and VandeBrake reductions for acceptance of responsibility. VandeBrake was not entirely forthcoming in his testimony and Stewart denied participating in a price-fixing scheme with VandeBrake regarding their 2009 price sheets, contrary to the admissions made by VandeBrake and Lake. An objection the court has resolved against Stewart. Nonetheless, the court concludes that Stewart's overall candor is sufficient to entitle him to a two level reduction for acceptance of responsibility.

### E. Determination Of Whether To Depart

Next, the court must consider whether a departure or a variance is appropriate. *See Lozoya*, 623 F.3d at 625-26; *Mireles*, 617 F.3d at 1012; *Roberson*, 517 F.3d at 993; *Rivera*, 439 F.3d at 447. At this stage, the court should initially "decide if any applicable Guidelines provisions permit a traditional 'departure' from the recommended sentencing range."[30] *Lozoya*, 623 F.3d at 625; *see Mireles*, 617 F.3d at 1012.

In discussing the propriety of departures generally, the Eighth Circuit Court of Appeals has instructed:

> Departures are appropriate if the sentencing court finds that there exists an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that

---

[30] As the Eighth Circuit Court of Appeals has explained:

> "'Departure' is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines." *Irizarry v. United States,* 553 U.S. 708, 128 S. Ct. 2198, 2202, 171 L. Ed. 2d 28 (2008). A variance, on the other hand, is a "non-Guidelines sentence[ ] based on the factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Solis-Bermudez,* 501 F.3d 882, 884 (8th Cir. 2007).

*Mireles*, 617 F.3d at 1012 n.2; *see Lozoya*, 623 F.3d at 626 (noting that, "[a]s opposed to a 'departure,' a 'variance' refers to a 'non-Guidelines sentence' based on the factors enumerated in section 3553(a)."); *United States v. Solis-Bermudez,* 501 F.3d 882, 884 (8th Cir. 2007) (explaining that departures are provided for in Chapter Five and Section 4A1.3 of the Guidelines).

described." U.S.S.G. § 5K2.0. The guidelines provide that
sentencing courts [are] to treat each guideline as carving out a
"heartland," a set of typical cases embodying the conduct that
each guideline describes. When a court finds an atypical case,
one to which a particular guideline linguistically applies but
where conduct significantly differs from the norm, a court may
consider whether a departure is warranted.
U.S.S.G. § 1A1.1, cmt. n. 4(b).

*United States v. Chase,* 451 F.3d 474, 482 (8th Cir. 2006). A defendant bears the burden

to prove that a downward departure is appropriate. *See United States v. Torres*, 563 F.3d

731, 734 (8th Cir. 2009); *United States v. Lussier,* 423 F.3d 838, 843 (8th Cir. 2005); *see*

*also In re Sealed Case*, 552 F.3d 841, 846 (D.C. Cir. 2009); *United States v. Manderson*,

307 Fed. App'x 34, 38 (9th Cir. 2008); *United States v. Escobar-Rivera*, 196 Fed. App's

852, 853 (11th Cir. 2006); *United States v. Payton*, 405 F.3d 1168, 1170 (10th Cir. 2005);

*United States v. McDowell*, 888 F.2d 285, 291 (3rd Cir. 1989).

The decision whether to depart from the advisory Sentencing Guidelines rests within

the sound discretion of the district court. *See Mireles*, 617 F.3d at 1015; *United States v.

Jones*, 596 F.3d 881, 893 (8th Cir.), *cert. denied*, 131 S. Ct. 229 (2010); *United States

v. Billue*, 576 F.3d 898, 905 (8th Cir.), *cert. denied*, 130 S. Ct. 765 (2009); *Torres*, 563

F.3d at 734; *United States v. Thin Elk*, 321 F.3d 704, 707-08 (8th Cir. 2003). However,

the Supreme Court has instructed that: "[b]efore a departure is permitted, certain aspects

of the case must be found unusual enough for it to fall outside the heartland of cases. . . ."

*Koon v. United States,* 518 U.S. 81, 98 (1996). Thus, a court must "carefully articulate

the reasons for departure, particularly where the waters are unchartered." *United States

v. Reinke,* 283 F.3d 918, 925-26 (8th Cir. 2002).

### 1.    *Defendant VandeBrake*

The prosecution has not sought an upward departure in either case and VandeBrake has not sought a downward departure.  The court does not believe that there are any sound bases for either a traditional upward or downward departure, that is, that there are features of VandeBrake's case that potentially take it outside the guidelines "heartland" and make it a special or unusual case warranting a departure provided for in Chapter Five or § 4A1.3 of the Guidelines.  Therefore, there will be no departures in VandeBrake's case.

### 2.    *Defendant Stewart*

On November 11, 2010, Stewart filed his Motion For the Court To Depart or Vary Downwar [sic] From the Advisory United Stated [sic] Sentencing Guidelines Range (docket no. 35).  In his motion, Stewart requests that the court grant him a downward departure under U.S.S.G. §§ 5K1.1, 5K2.0, 5K2.11, and 5K2.12.  In response, the prosecution points out that, under the terms of the plea agreement between Stewart and the prosecution, the parties agreed not to seek a sentence outside of the guidelines range.[31]

---

[31]The plea agreement provides in pertinent part:

> The parties agree that there exists no aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the U.S. Sentencing Commission in formulating the Sentencing Guidelines justifying a departure pursuant to U.S.S.G. § 5K2.0.  The parties agree not to seek or support any sentence outside of the Guidelines range nor any Guidelines adjustment for any reason that is not set forth in this Plea Agreement.  The parties further agree that the recommended sentence set forth in this Plea Agreement is reasonable.

Plea Agreement, docket no. 11 in CR10-4028-MWB, at ¶ 8.

The prosecution further argues that Stewart is not entitled to a departure pursuant to any of these sentencing provisions. The court will discuss each of Stewart's claims in turn.

### a.    *Departure under U.S.S.G. § 5K1.1*

Stewart initially seeks a downward departure based on U.S.S.G. § 5K1.1 for substantial assistance. "'Absent a motion by the government, a district court generally lacks the authority to grant a downward departure based on a defendant's substantial assistance.'" *United States v. Davis*, 397 F.3d 672, 676 (8th Cir. 2005) (quoting *United States v. Wolf,* 270 F.3d 1188, 1190 (8th Cir. 2001)). This is because, unless a plea agreement provides to the contrary, "'§ 5K1.1 give[s] "the Government a power, not a duty, to file a motion when a defendant has substantially assisted"'" in the prosecution or investigation of other persons involved in criminal activity." *United States v. Smith*, 574 F.3d 521, 525 (8th Cir. 2009)(quoting *United States v. Perez*, 526 F.3d 1135, 1138 (8th Cir. 2008) (quoting in turn *Wade v. United States,* 504 U.S. 181, 185 (1992)).

Here, Stewart argues that he is entitled to a downward departure, pursuant to § 5K1.1, because he has fully cooperated with the prosecution and that the prosecution is required to make such a motion under the terms of his plea agreement. Stewart argues that the prosecution's failure to do so constitutes a breach of his plea agreement and requests that the court grant him specific performance of the plea agreement by compelling the prosecution to file a motion for downward departure under § 5K1.1.

The key provisions in the plea agreement regarding a motion for departure pursuant to § 5K1.1 are located in paragraph 9 and provide as follows:

> 9.    The United States and the defendant agree that the applicable Guidelines imprisonment range exceeds the term of imprisonment contained in the recommended sentence set out in Paragraph 8 above. Subject to the full and continuing cooperation of the defendant, as described in paragraph 12 of

this Plea Agreement, and prior to sentencing in this case, the United States agrees that it will make a motion, pursuant to U.S.S.G. § 5K1.1, for a three-level downward departure from the Guidelines fine and imprisonment range in this case and will request that the Court impose the fine and imprisonment contained in the recommended sentence set out in Paragraph 8 of this Plea Agreement because of the defendant's substantial assistance in the government's investigation and prosecutions of federal criminal law in the ready-mix concrete industry. With the U.S.S.G. § 5K1.1 departure, the resulting offense level is 8. The defendant is free to argue for any sentence within the applicable Sentencing Guidelines range as determined by the Court. The defendant agrees that the $20,000 fine amount is appropriate.

Stewart Plea Agreement at ¶ 9 (docket no. 11 in CR10-4028-MWB).

As discussed above, the court has found that the prosecution is not in breach of the plea agreement, because Stewart has failed to demonstrate that the prosecution acted in bad faith in determining to void its obligations under the plea agreement. Consequently, the terms of the plea agreement, including the terms contained in paragraph 9, are no longer binding on the prosecution. As such, there is no basis for the court to enforce the terms of the plea agreement by ordering, through specific performance, the prosecution to file a motion for downward departure under § 5K1.1.

Even if the court were to assume, *arguendo*, that the terms of the plea agreement were still binding on the prosecution, the plea agreement explicitly provides that the prosecution retained the discretion whether to file a motion for downward departure. Thus, under the terms of the plea agreement, the prosecution did not bind itself to file a motion for downward departure, but reserved the right to make its own assessment of whether Stewart provided "full and continuing cooperation." Since the prosecution did not bargain away its discretion about whether to make a downward departure motion, the

prosecution's decision to not move for a substantial assistance departure can be reviewed by the court only "'"if such refusal (1) was prompted by an unconstitutional motive, such as the defendant's race or religion; or (2) was not rationally related to a legitimate government interest."'" *United States v. Davis*, 583 F.3d 1081, 1098 (8th Cir. 2009) (quoting *Perez,* 526 F.3d at 1138) (quoting in turn *United States v. Mullins,* 399 F.3d 888, 890 (8th Cir. 2005)).[32] In order for a defendant to be entitled to a hearing on a motion to compel the prosecution to make a substantial assistance motion, a defendant must make a "'substantial threshold showing that the government's refusal to make a substantial assistance motion was premised on an improper motive.'" *Smith*, 574 F.3d at 525 (quoting *Perez,* 526 F.3d at 1138) (quotations omitted)). As the Eighth Circuit Court of Appeals instructed in its *Davis* decision,

> To make the requisite showing, a defendant must do more than present evidence of the defendant's substantial assistance and must make more than "generalized allegations of improper motive." *Id.* We require the defendant to "make a 'substantial threshold showing.'" *Id.* (quoting *Mullins,* 399 F.3d at 890). This is so, because we "presume a prosecutor has properly discharged [his] duties absent clear evidence to the contrary." *Id.* (quoting *United States v. Pamperin,* 456 F.3d 822, 825 (8th Cir. 2006)).

*Davis*, 583 F.3d at 1098.

Stewart does not allege that the prosecution has refused to file a motion for downward departure for suspect reasons such as his gender, race, or religion, or that the refusal to file the motion was not rationally related to any legitimate government end.

---

[32]There is an intra-circuit split in the Eighth Circuit Court of Appeals over whether bad faith on the part of the prosecution constitutes an additional basis for compelling a motion for downward departure based on substantial assistance. *See Davis*, 583 F.3d at 1098 (recognizing "'intra-circuit split'") (quoting *Perez*, 526 F.3d at 1138).

Indeed, there is not even a faint whiff here that the prosecution's actions were prompted by bad faith, an unconstitutional motive, or a reason unrelated to a legitimate government end. Instead, Stewart contends that he provided the prosecution with ongoing, full and truthful cooperation as required by his plea agreement. The prosecution, however, disagrees with Stewart's assessment. Stewart's bare allegation that he provided substantial assistance does not qualify as the "substantial threshold showing" of prosecutorial discrimination or irrational conduct. *See Wade,* 504 U.S. at 186 ("[A] claim that a defendant merely provided substantial assistance will not entitle a defendant to a remedy or even to discovery or an evidentiary hearing. Nor would additional but generalized allegations of improper motive."); *Godinez,* 474 F.3d at 1044 ("A defendant's bare assertions that he provided substantial assistance are insufficient to require a hearing on the matter without more specific allegations of improper motive."). Therefore, the court concludes that, because the prosecution retained the discretion to determine whether to file a motion for downward departure and Stewart has failed to make the necessary "substantial threshold showing" to challenge the prosecution's decision not to move for downward departure, Stewart's motion for a downward departure based on § 5K1.1 for substantial assistance is denied.

### b.    *Departure under U.S.S.G. § 5K2.11*

Stewart also seeks a downward departure under U.S.S.G. 5K2.11. He argues that he committed the charged Sherman Act offense to avoid a greater harm, the threatened loss of his business and its over forty jobs posed by GCC due to its unfair competitive advantage. The prosecution counters that Stewart is not entitled to a downward departure under § 5K2.11.

Section 5K2.11 provides:

**<u>Lesser Harms</u> (Policy Statement)**

58

Sometimes, a defendant may commit a crime in order to avoid a perceived greater harm. In such instances, a reduced sentence may be appropriate, provided that the circumstances significantly diminish society's interest in punishing the conduct, for example, in the case of a mercy killing. Where the interest in punishment or deterrence is not reduced, a reduction in sentence is not warranted. For example, providing defense secrets to a hostile power should receive no lesser punishment simply because the defendant believed that the government's policies were misdirected.

In other instances, conduct may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue. For example, where a war veteran possessed a machine gun or grenade as a trophy, or a school teacher possessed controlled substances for display in a drug education program, a reduced sentence might be warranted.

U.S.S.G. § 5K2.11, p.s.

Section 5K2.11 permits a court to depart downward from the applicable sentencing range in two circumstances: First, where the defendant "commit[s] a crime to avoid a perceived greater harm . . . provided that the circumstances significantly diminish society's interest in punishing the conduct." U.S.S.G. § 5K2.11. Second, the Eighth Circuit Court of Appeals has recognized that "U.S.S.G. § 5K2.11 permits a sentencing court to depart downward from the otherwise applicable sentencing guideline range when the defendant's conduct does not "'cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue.'" *United States v. Lewis*, 249 F.3d 793, 795 (8th Cir. 2001) (quoting U.S.S.G. § 5K2.11)(holding that the "lesser harms" rationale of § 5K2.11 permits a sentencing court to depart for violations of 18 U.S.C. § 922(a)(6), making a false statement in connection with the acquisition of a firearm).

Stewart's argument here is confined to the first ground.[33]   As noted above, Stewart has moved for a downward departure on the first ground, arguing that his involvement in the conspiracy with VandeBrake was designed to avoid the greater harm of Great Lakes being run out of the concrete business by GCC and the resulting loss of over forty good-paying jobs in northwest Iowa.

Tellingly, Stewart identifies no case where a court has actually granted a § 5K2.11 departure on a Sherman Act violation on the basis of preserving a business and its jobs. Indeed, there are few cases addressing a downward departure under § 5K2.11's first ground and the court has found none in the context of a Sherman Act violation. *See, e.g., United States v. Harris*, 322 Fed. App'x 55, 57 (4th Cir. 2009) (upholding downward departure under § 5K2.11 for defendant convicted of felon in possession of ammunition where defendant possessed ammunition "to avoid a greater harm to leaving the ammunition out where children could be injured or otherwise harmed by it."); *United States v. Barajas-Nunez,* 91 F.3d 826, 832 (6th Cir. 1996) (holding that a deported alien who returned to the United States to assist his girlfriend who was pregnant with his child while she underwent surgery did not deserve a downward departure under 5K2.11 but that the district court's granting such a departure was not plain error); *United States v. Carvell,* 74 F.3d 8, 12 (1st Cir. 1996) (affirming downward departure under § 5K2.11 where the defendant grew and used marijuana to treat his depression as alternative to suicide). However, a downward departure under 5K2.11 "'applies only in narrow, extreme circumstances such as mercy killing.'" *United States v. Herandez*, 103 Fed. App'x 882,

---

[33]Even if the court construed Stewart's argument to be also based on 5K2.11's second ground, his conviction and sentence address the very harm Congress sought to prevent in the Sherman Act.  Thus, a downward departure based on 5K2.11's second ground is not warranted.

883 (6th Cir. 2004) (quoting *Barajas-Nunez,* 91 F.3d at 832); *see United States v. Garcia*, 189 Fed. App'x 819, 822 (10th Cir. 2006) (noting that 5K2.11 "should be interpreted narrowly."). Moreover, a departure under § 5K2.11 "'is typically inappropriate where the defendant could have pursued other means of avoiding the greater harm rather than committing a crime.'" *United States v. Rooney*, 370 F. Supp.2d 310, 316 (D. Maine 2005) (quoting *United States v. Grewal*, 2 F. Supp.2d 612, 624 (D.N.J. 1998)).

The court finds that Stewart has failed to sustain his burden to demonstrate that he is entitled to a downward departure based on 5K2.11's first ground. Significantly, the court notes that there is no evidence in the sentencing record that Great Lakes was suffering from financial distress which would require Stewart to resort to illegal means to ensure its survival. Indeed, Great Lakes turned a tidy profit in the years 2007, 2008, and 2009, earning $1,645,026 in 2007, $2,049,527 in 2008, and $2,936,877 in 2009. Defendant Stewart's Exs. 11, 12, 13. This demonstrates that Great Lakes was profitable both before and after GCC was formed by Grupo Cementos de Chihuahua's purchasing Alliance in January 2008. Thus, there was simply no need for Stewart to engage in Sherman Act violations to keep Great Lakes afloat financially.

Moreover, even if the court were to assume for the sake of argument that Stewart's actions were driven by his perception that GCC had an unfair competitive advantage and he thought engaging in Sherman Act violations was a lesser harm than facing the loss of his business with its resulting loss of jobs, the court does not hold such a view. Rather than pursue alternative legitimate means to save Great Lakes, or simply accept, as many businessmen in this economy do everyday, the failure of Great Lakes and the need to sell out to GCC, Stewart chose to ignore society's greater interest in preserving free and unfettered competition, which is the hallmark of America's free-enterprise system, by

participating in a conspiracy whose goal was the antithesis of that system. Thus, Stewart's motion for a downward departure based on § 5K1.11 for lesser harm is denied.

### c. *Departure under U.S.S.G. § 5K2.12*

Stewart also requests a downward departure in his sentence pursuant to U.S.S.G. § 5K2.12. Stewart's argument here is similar to his lesser harms argument. Stewart argues that he was acting under duress that resulted from his concern for his employees' and his customers' financial well being if Great Lakes ceased operation as a result of the economic pressures being brought to bear on Great Lakes by GCC. The prosecution argues that Stewart is not entitled to a downward departure under § 5K2.12.

Section 5K2.12 provides:

> <u>Coercion and Duress</u> **(Policy Statement)**
>
> If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may depart downward. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions, on the proportionality of the defendant's actions to the seriousness of coercion, blackmail, or duress involved, and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be. Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency. Notwithstanding this policy statement, personal financial difficulties and economic pressures upon a trade or business do not warrant a downward departure.

U.S.S.G. § 5K2.12. p.s.

As the Eighth Circuit has noted,

> Although "'serious coercion, blackmail or duress'" is a
> potential ground for departure under § 5K2.12, "'[o]rdinary
> coercion will be sufficiently serious to warrant departure only
> when it involves a threat of physical injury, substantial damage
> to property or similar injury resulting from the unlawful action
> of a third party or from a natural emergency.'" *[United States
> v. Contreras,* 180 F.3d 1204, 1211 (10th Cir. 1999)] (quoting
> U.S.S.G. § 5K2.12). Absent these specific serious threats,
> coercion is a discouraged basis for departure and must be
> present in some unusual or exceptional way to warrant
> departure from the Guidelines range. *Id.* at 1212.

*United States v. King,* 280 F.3d 886, 890 (8th Cir. 2002).

The "economic pressures" limitation precludes the availability of a § 5K2.12 downward departure in Stewart's case. Even if the court were to assume that Stewart was extremely stressed by the thought of his company being driven out of business by GCC and the effect that would have on his employees, the resulting duress constituted nothing more than "economic pressures upon a trade or business." Section 5K2.12's "economic pressures" limitation, however, requires the court to deny Stewart's motion since "economic pressures upon a trade or business", here Stewart's business, as opposed to the threats, were the cause of his illegal actions. *See United States v. Haversat*, 22 F.3d 790, 796 (8th Cir. 1994) (holding that district court erred in relying on economic coercion as ground for downward departure); *see also United States v. Coble*, 11 Fed. App'x 193, 200 (4th Cir. 2001) (holding that under 5K2.12 "[t]o the extent that the district court relied upon the duress arising from the economic hardship imposed by the IRS liens, that is a forbidden factor."); *United States v. Pozzy*, 902 F.2d 133, 139 (1st Cir. 1990) (holding that § 5K2.12 departure was not warranted where defendant's motivation for her illegal actions was money); *United States v. Contreras,* 180 F.3d 1204, 1211 (10th Cir. 1999) (holding that defendant's financial dependence on father and economic coercion were

impermissible considerations under 5K21.12).[34] Therefore, the court finds that Stewart has failed to sustain his burden to demonstrate his entitlement to a § 5K2.12 downward departure on the basis of coercion or duress and his motion for downward departure under § 5K2.12 is denied.

### d. Departure under U.S.S.G. § 5K2.0

Finally, Stewart seeks a downward departure in his sentence pursuant to U.S.S.G. § 5K2.0. Stewart argues for a downward departure based on his indispensability to Great Lakes and the resulting extraordinary hardship that would be placed on his employees in the event of his incarceration. The prosecution contends that Stewart is also not entitled to a downward departure under § 5K2.0 and points out that he agreed in his plea agreement that there were no circumstances in his case justifying a departure pursuant to § 5K2.0.

In support of his argument, Stewart directs the court to *United States v. Milikowsky,* 65 F.3d 4 (2d Cir. 1995), where the Second Circuit Court of Appeals affirmed the district court's granting of a downward departure to avoid imprisoning a defendant when his imprisonment would cause extraordinary hardship on the defendant's employees. *Id.* at 5. In *Milikowsky,* the defendant, who was a principal in several steel-related businesses, was convicted of violating the Sherman Act. *Id.* at 6. At the time of sentencing, the

---

[34]Even if economic pressures on a trade or business was a viable basis for a downward departure under 5K2.12, the court concludes there is some obligation on Stewart to demonstrate that he had no reasonable alternative to committing his criminal acts here. *See United States v. Lopez-Garcia,* 316 F.3d 967, 973 (9th Cir. 2003) (holding that defendant was not entitled to § 5K2.12 downward departure where she failed to tell border agents she was in danger and instead continued to smuggle aliens into the United States). Here, instead of engaging in the charged Sherman Act violations, Stewart could have availed himself of the Justice Department's Leniency Program and informed law enforcement personnel about VandeBrake's activities in the ready-mix concrete industry.

defendant's two remaining businesses employed more than 150 people. *Id.* at 8-9. Before sentencing, the defendant submitted letters which established that, for one of his businesses, he was the sole buyer of all steel, the most successful seller and the only contact the business had with customers and suppliers. *Id.* at 8. The defendant also established that, at his other business, "the cost advantage attributable to his expertise is virtually the only reason [the business] remains a viable operation." *Id.* The sentencing record further established that without the defendant, his businesses would likely be forced into bankruptcy. *Id.* The district court granted the defendant's request for a downward departure based on the extraordinary impact his imprisonment would have had on his employees and sentenced him to a term of probation. In affirming, the Second Circuit Court of Appeals observed:

> On the basis of this record, we cannot find clear error in the court's conclusion that imprisoning Milikowsky would have extraordinary effects on his employees to a degree not adequately taken into consideration by the Sentencing Commission. While we agree with our sister circuits that business ownership alone, or even ownership of a vulnerable small business, does not make downward departure appropriate, *see* cases cited *supra,* departure may be warranted where, as here, imprisonment would impose extraordinary hardship on employees.

*Milikowsky*, 65 F.3d at 9. The First Circuit Court of Appeals has also found that business impact is a permissible consideration in weighing whether to grant a downward departure. *See United States v. Olbres,* 99 F.3d 28, 36 (1st Cir. 1996) (observing that "job loss to innocent employees resulting from incarceration of a defendant may not be categorically excluded from consideration" but noting that "[t]he mere fact that innocent others will themselves be disadvantaged by the defendants' imprisonment is not alone enough to take a case out of the heartland.").

Unlike the defendant in *Milikowsky*, Stewart cannot demonstrate that an extraordinary hardship will befall Great Lakes's employees if he is incarcerated. As Great Lakes's general manager, Stewart is the key employee of the business. He does all of Great Lakes's pricing, job bidding and handles its finances, including the purchasing of the ingredients for the manufacturing of concrete, and the buying and selling of equipment needed for the business. Stewart works directly with contractors, visiting job sites and fielding customer complaints. In addition, he is responsible for overseeing the mining of aggregate, and, when needed, he steps in to run a front end loader or load ready-mix concrete. Stewart's other job responsibilities include obtaining insurance quotes for Great Lakes's general liability and medical insurance, and working with Carol Kleve, Great Lakes's bookkeeper, to complete Great Lakes's air emissions and water permits. Nonetheless, unlike the steel businesses in *Milikowsky,* which were on the brink of bankruptcy and required the defendant's expertise to stay in business, Great Lakes is on sound financial footing. Great Lakes has shown profits over the past three years totaling $6,631,440. The significance of this fact is that Great Lakes, unlike the businesses in *Milikowsky*, is in an excellent position to hire someone to replace Stewart as the company's general manager. Both Dennis Rode and Brian Bosshart, who collectively own one-third of Great Lakes, conceded that a replacement for Stewart could be hired, albeit with some difficulty. The court agrees with Rode and Bosshart's assessments and finds that Great Lakes should be able to locate and hire someone with the experience in the concrete industry to fill Great Lakes's general manager position. Accordingly, the court finds that Stewart has not established that his presence is indispensable for Great Lakes's continued financial viability or that in his absence an extraordinary hardship will befall Great Lakes's

employees.[35]   Therefore, the court finds that Stewart has failed to sustain his burden to demonstrate his entitlement to a § 5K2.0 downward departure on the basis of the impact Stewart's absence would have on Great Lakes's business and its employees, and his motion for downward departure under § 5K2.0 is denied.[36]   Accordingly, the court turns to consider whether the § 3553(a) factors justify a variance from the calculated guidelines sentence. *See Mireles*, 617 F.3d at 1012; *Miller*, 479 F.3d at 986.

## F.  Do § 3553(a) Considerations Justify A Variance?

### 1.    The § 3553(a) Factors

The final step in the determination of a defendant's sentence is to apply the factors in 18 U.S.C. § 3553(a). *See Lozoya*, 623 F.3d at 626; *Roberson*, 517 F.3d at 993; *Rivera*, 439 F.3d at 447. The § 3553(a) factors are "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); "the need for the sentence imposed," § 3553(a)(2), including the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," § 3553(a)(2)(A), "to afford adequate deterrence to criminal conduct," § 3553(a)(2)(B), "to protect the public from further crimes of the defendant," § 3553(a)(2)(C), and "to provide the defendant with needed educational or vocational training" or other care or treatment, § 3553(a)(2)(D); "the kinds of sentences available,"

---

[35]The court notes that in 2009 Stewart was in Florida during all of January and February. *See* Gov't Ex. C. at 112. Thus, at least in the slower winter months, Stewart's daily presence at Great Lakes is not required.

[36]To the extent that Stewart is also seeking a sentencing variance on the basis of the impact of his absence on Great Lakes's business and employees, the court finds that a variance is unwarranted.

§ 3553(a)(3); "the kinds of sentence and the sentencing range established" for similar offenses, § 3553(a)(4); "any pertinent policy statement," § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6); and "the need to provide restitution to any victims of the offense," § 3553(a)(7). In considering the § 3553(a) factors in the last step of the sentencing methodology, "[a] district court is not required to recite each of the sentencing factors under 18 U.S.C. § 3553(a), as long as the record makes clear that they were considered." *United States v. Powills*, 537 F.3d 947, 950 (8th Cir. 2008) (citing *United States v. Hernandez*, 518 F.3d 613, 616 (8th Cir. 2008), and *Rita v. United States*, 551 U.S. 338, 356-358 (2007)). The court, therefore, turns to consider the § 3553(a) factors with respect to each defendant.

### 2.     Defendant VandeBrake

After balancing the § 3553(a) factors, the court finds that a guideline sentence of 21 to 27 months for VandeBrake is woefully inadequate and not "sufficient, but not greater than necessary" to accomplish the goals of sentencing. 18 U.S.C. § 3553(a). Rather, the court finds that a sentence significantly higher than a guideline sentence but well below the statutory maximum of 120 months, is appropriate in VandeBrake's case. Although the court has determined that an upward variance is appropriate, how much to vary upward requires consideration of the § 3553(a) factors. *See United States v. Papakee,* 573 F.3d 569, 576-77 (8th Cir. 2009) (the question is whether the § 3553(a) factors, as a whole, justify the extent of a variance).

### a.     The nature and circumstances of the offense/need for sentence

One part of the first § 3553(a) factor requires the court to consider "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). The second § 3553(a) factor is "the need for the sentence imposed," § 3553(a)(2), including the need for the sentence "to

reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," § 3553(a)(2)(A), "to afford adequate deterrence to criminal conduct," § 3553(a)(2)(B), "to protect the public from further crimes of the defendant," § 3553(a)(2)(C), and "to provide the defendant with needed educational or vocational training" or other care or treatment, § 3553(a)(2)(D). Because these two factors largely overlap, the court will discuss them together. *See United States v. Irey*, 612 F.3d 1160, 1198 (11th Cir. 2010) (noting that "[t]o a large extent 'the nature and circumstances of the offense' . . . factor overlaps with the next listed consideration, which is 'the need for the sentence imposed-to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.'").

At the outset, it is useful to briefly review the background, purpose and policies underlying the Sherman Act. The court notes that the United States Supreme Court has offered the following explanation of the policies underlying the Sherman Act:

> "The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition."

*NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n.27 (1984) (quoting *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958)); see *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978) ("The Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services."); *see also Tal v. Hogan*, 453 F.3d 1244, 1258 (10th Cir.

69

2006) ("The primary concern of the antitrust laws is the corruption of the competitive process . . . ."); S*CFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 963 (10th Cir. 1994) ("the Act's basic objective[] [is] the protection of a competitive process") (internal quotations omitted); *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1437 (7th Cir. 1986) ("The purpose of antitrust law, at least as articulated in the modern cases, is to protect the competitive process . . . .").

The Supreme Court has offered this account of circumstances giving rise to the Sherman Act's passage:

> [The Sherman Act] was enacted in the era of 'trusts' and of 'combinations' of businesses and of capital organized and directed to control of the market by suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern. The end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public injury.

*Apex Hosiery v. Leader*, 310 U.S. 469, 492 (1940). In *United States v. Columbia Steel Co.*, 334 U.S. 495 (1948), Justice Douglas echoed similar sentiments in dissent:

> Industrial power should be decentralized. It should be scattered into many hands so that the fortunes of the people will not be dependent on the whim or caprice, the political prejudices, the emotional stability of a few self-appointed men. The fact that they are not vicious men but respectable and social minded is irrelevant. That is the philosophy and the command of the Sherman Act.

*Columbia Steel Co.*, 334 U.S. at 536 (Douglas, J., dissenting).

The conclusion to be drawn from these authorities is that the Sherman Act was aimed at protecting competition in America's free-enterprise system, and in doing so, protecting consumer welfare. *See, e.g.*, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) (noting that Congress designed the Sherman Act as a "consumer welfare prescription") (quoting ROBERT H. BORK, THE ANTITRUST PARADOX 66 (1978)); *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 128 F.3d 59, 63 (2d Cir. 1997) ("the Sherman Act's essential purpose [is] safeguarding consumer welfare"); *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 960 (10th Cir. 1990) ("the purpose of the antitrust laws is the promotion of consumer welfare") (quoting *Westman Comm'n Co. v. Hobart Int'l Inc.*, 796 F.2d 1216, 1220 (10th Cir. 1986)); *Key Fin. Planning Corp. v. ITT Life Ins. Corp.*, 828 F.2d 635, 642 (10th Cir. 1987) ("the antitrust laws were designed to protect and promote consumer welfare"); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986) ("the purpose of the antitrust laws [is] the promotion of consumer welfare").

Given the important purpose served by the Sherman Act, the relatively low maximum sentence under the Sherman Act and the rather lax sentencing structure under the Sentencing Guidelines for Sherman Act violations is surprising.[37] The court notes that

---

[37]Indeed, this point is exemplified by a recent story in the New York Times which reported on the arrest of Sven Koppler for illegally importing tarantulas, including rare Mexican red-kneed tarantulas (*Brachypelma smithi*) which are protected under the Convention of International Trade in Endangered Species. *See* Rebecca Cathcart, *German Charged with Shipping Tarantulas*, NEW YORK TIMES, Dec. 4, 2010, at A14, *available at* http://www.nytimes.com/2010/12/04/us/04spiderman.html?scp=1&sq=tarantulas&st=cse. The article states that Koppler is charged with "one count of illegally importing wildlife into the United States, which carries a maximum penalty of 20 years in federal prison and a $250,000 fine." *Id.* Koppler is alleged to have smuggled tarantulas into the

(continued...)

at the time of the Sherman Act's enactment in 1890, violations of the Act were misdemeanors only punishable by up to one year in prison.  *See* Pub. L. 93-528, § 3, 88 Stat. 1708 (1974) (amending punishment under Sherman Act).  Congress did not make Sherman Act antitrust violations felonies until 1974, when it increased the maximum prison sentence to three years.  *See* Pub. L. 93-528, § 3, 88 Stat. 1708.  Ten years later, with the passage of the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Congress more than tripled the maximum penalties for individuals from a possible term of imprisonment of three years to ten years.  *See* Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, 118 Stat. 665 (2004).  Even now, violation of the Sherman Act remains one of the few federal felonies that does not result in the loss of one's right to own firearms.  *See* 18 U.S.C. § 921(a)(20)(A).[38]  Moreover, in considering

---

[37](…continued)

United States by "bundl[ing] them in multicolored straws or plastic containers and sen[ding] them in boxes though the United States Postal Service." *Id.*  Why would one do this?  The article reports that tarantulas can fetch up to $1,000 each and that "[t]arantulas, especially endangered ones, are 'highly sought after by collectors,'. . .because they 'make good pets,' and can live up to 30 years." *Id.*  The court's own research revealed that on December 1, 2010, Koppler was, in fact, charged in a single count criminal complaint filed in the United States District Court for the Central District of California, with importing wildlife contrary to law, in violation of 18 U.S.C. § 545. *See United States v. Koppler*, 2:10-marijuana-02902M (Dec. 1, 2010).  The maximum penalty for violating § 545 is 20 years imprisonment.  Thus, the possible maximum penalty for smuggling tarantulas into the United States is twice the penalty provided for under the Sherman Act.

[38]Enacted as part of the Gun Control Act of 1968, § 921(a)(20(A) creates an exception that allows gun possession despite a prior conviction for an antitrust or business regulatory crime.  The section provides as follows.

> (20) The term "crime punishable by imprisonment for a term exceeding one year" does not include--

(continued…)

a co-conspirator's relevant conduct for sentencing purposes, the Sentencing Guidelines treat antitrust violators distinctly different than those individuals convicted of fraud offenses. Typically, the Sentencing Guidelines include as relevant conduct in the case of a jointly undertaken criminal activity all (1) "reasonably foreseeable acts and omissions of others" (2) "in furtherance of" (3) "the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). "These elements closely correspond to the classic statement of the

---

[38](...continued)

> (A) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or
>
> . . . .
>
> What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

18 U.S.C. § 921(a)(20)(A). Because federal antitrust violations were misdemeanors at the time of the Gun Control Act of 1968's passage, it is unclear what the impetus was for this section's inclusion in the bill. After a careful and exhaustive search, the court's review of the legislative history of the Gun Control Act of 1968 failed to disclose either the sponsor of this language or the reason for its inclusion. Equally mysterious is the reason why this provision remained unchanged after Congress made Sherman Act antitrust violations felonies in 1974. There are hundreds of other crimes, both economic and non-violent, the conviction of which results in the loss of the privilege to possess firearms.

common law requirements for substantive conspiracy liability." *United v. Spotted Elk*, 548 F.3d 641, 673 (8th Cir. 2008); *see Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946) ("A different case would arise if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.").[39] The Sentencing Guidelines for Sherman Act violations, however, unlike the Sentencing Guidelines for fraud offenses, do not take into account relevant conduct of co-conspirators because the volume of commerce attributable to an individual participant in a Sherman Act conspiracy does not include the actions of co-conspirators, but only "the volume of commerce done by him or his principal in goods and services that were effected by the violation." U.S.S.G. § 2R1.1(b)(2). This Sentencing Guideline anomaly results in the disproportionately more lenient treatment of antitrust offenses than fraud crimes, or other types of offenses. One cannot help but wonder why sentences under the Sherman Act are so low. Is it the result of be explicit and/or implicit bias on behalf of Congress? The captains of American industry at the time of the Sherman Act's passage in 1890, and the most likely targets of prosecution under the Sherman Act, were the likes of J.P. Morgan, John D. Rockefeller, Andrew Carnegie, and Meyer Guggenheim. These individuals were almost exclusively wealthy, white, Anglo-Saxon, protestant males who were politically well-connected. Although the demographics of American industry have changed since 1890, the overly lenient sentencing (in my view) for white collar, antitrust

---

[39]The court notes that relevant conduct is narrower than *Pinkerton* liability. U.S.S.G. § 1B1.3, comment. (n.1); *see Spotted Elk*, 548 F.3d at n.11 (recognizing that "the November 1992 amendment clarified that relevant conduct was narrower than *Pinkerton* liability.").

criminals found in the origins of the Sherman Act lingers today in the United States Sentencing Commission Guidelines.

The Sherman Act prohibits price-fixing agreements and, in doing so, provides protection against the threat of harm to "the central nervous system of the economy" caused by such agreements. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 (1940). The social utility of the Sherman Act in preventing price-fixing agreements would, therefore, appear to be at least as great, if not greater, than the protections offered by fraud statutes. After all, fraud schemes target only discreet segments of the general population while antitrust violations go to the heart of our economic free enterprise system because they have the possibility of negatively affecting the entire economy. Yet, the penalties for Sherman Act violations are disproportionately lower than those for mail and wire fraud. Accordingly, the court concludes that antitrust guideline § 2R1.1 is deserving of less deference.

The court detailed above the factual circumstances of VandeBrake's offenses. At first blush, VandeBrake's offenses appear to constitute nothing more than a mine-run antitrust case. However, upon closer inspection, several unusual circumstances come to light which reveal the truly serious nature of VandeBrake's commercial crimes. First, the subject of all three conspiracies, ready-mix concrete, is a necessity product, rather than a luxury or trifle. "Concrete is used more than any other man-made material in the world." Wikipedia, *Concrete, available at* http://en.wikipedia.org/wiki/Concrete (last visited January 11, 2011). It is necessary for a wide array of construction projects. Concrete is used in the construction of, among other things, buildings, bridges, roadways, dams, foundations, parking lots, sidewalks, and driveways. In other words, concrete is employed in the construction of significant portions of our nation's infrastructure. Indeed, one would be hard pressed to gaze in any direction in a modern city and not see an architectural

structure which does not have as a component, some concrete. Moreover, in many instances, there will be no reasonable substitute for concrete. For instance, any individual or family seeking to build a new home, or a community planning to construct a new school, will be required to purchase concrete for their new building's foundation. Thus, the price of concrete in turn determines the price of all projects in which it is used and has a secondary effect on our economy. Excess monies spent on VandeBrake or his co-conspirator's overpriced concrete deprived their concrete purchasers of the option and ability to spend those lost monies on other products. This is particularly troublesome when one considers the fact that a number of projects that VandeBrake rigged bids on were public works. By rigging bids on these public works projects, VandeBrake effectively robbed several local governments of monies that could have been used for the betterment of their communities. Given VandeBrake's utter lack of involvement in any charitable or civic activities, this is hardly surprising.

Further compounding the restriction on VandeBrake's victims' choice of substitute products here is the fact that ready-mix concrete has a twenty-five mile travel limit, and most concrete companies will not travel that far. *See* PSIR at 14 n.9. By entering into three separate conspiracies to fix the price of concrete, all in northwest Iowa, VandeBrake effectively created his own concrete cartel. The significance of these facts is that the victims of VandeBrake's conspiracies had substantially fewer or, in some instances, no market options by which they could avoid purchasing concrete from VandeBrake or his co-conspirators. As a result, VandeBrake used his regional quasi-monopolistic power in the concrete industry to extract unlawful monies from his company's customers. Even then, VandeBrake's greed was unsatiated and he went so far as to double-cross one of his conspirators when the occasion arose in order to further profit from his illegal endeavors. VandeBrake and CW-2 agreed to rig bids on two projects, construction of a water

treatment plant in Sioux City, Iowa, and construction at Dordt College, so that GCC and Siouxland would each win one project. Siouxland was designated with win the Sioux City water treatment plant project. VandeBrake, however, double-crossed CW-2 by having GCC submit a bid which undercut Siouxland's bid by approximately $1 per cubic yard.

Under the circumstances of VandeBrake's case, the 1-level enhancement of VandeBrake's advisory guidelines sentence pursuant to U.S.S.G. § 2R1.1(b)(1) for participating in an agreement to submit non-competitive bids does not even begin to correlate to the nature and extent of the harm that VandeBrake's schemes inflicted on the people and businesses in northwest Iowa who had little or no choice but to accept VandeBrake or his co-conspirator's rigged bids for the concrete required for their respective projects. *See United States v. White*, 506 F.3d at 635, 645 (8th Cir. 2007) (the court may vary upward on the basis of factors already taken into account in the formulation of the guidelines). VandeBrake's conduct in perpetrating the three price-fixing conspiracies shows at least as much disregard for the consequences to others, if not downright intent to economically harm not only his customers but their communities, as can be attributed to the average drug dealer, or even a mid-level or high-level drug conspirator, who could easily face a mandatory *minimum* statutory sentence at least as long as VandeBrake's *maximum* statutory sentence. However, VandeBrake's advisory guideline sentence here is not increased whatsoever as a result of his involvement in multiple conspiracies. Counts 1 through 3 have been grouped so that the offense level applicable to this group is the offense level corresponding to the aggregated volume of commerce involved in all three conspiracies, $5,666,348.61. Nonetheless, because the volume of commerce in Count 3 alone is $4,980,348.61, the offense level for that count is the same as that for all three counts as grouped. Thus, VandeBrake's guideline sentence here is not altered one iota as a result of his involvement in the conspiracies in Counts 1 and 2.

VandeBrake's perpetration of these three conspiracies, which inflicted economic harm across northwest Iowa on his victims and their communities, warrants an upward variance in his sentence.

The court further concludes that because of a flaw in U.S.S.G. § 2R1.1(b)(2), application of that section fails to provide a just and reasoned sentencing range given the facts of VandeBrake's case. The Sentencing Commission has explained that the offense levels for antitrust violations were increased in § 2R1.1 "to make them more comparable to the offense levels for fraud with similar amounts of loss." U.S.S.G. app. C, amend. 377. The base offense level for antitrust violations begins at a higher level than the base offense level for fraud violations "in order to reflect the serious nature of and the difficulty of detecting such violations." *Id*. However, the base offense level for antitrust violations then increases less rapidly than the offense level for fraud violations "in part, because, on the average, the level of mark up from an antitrust violation may tend to decline with the volume of commerce involved." *Id*. This assumption is incorrect in this case, particularly with respect to VandeBrake's price-fixing of concrete sales through GCC's price list. GCC would establish a price list in January for a given year and then stick to that price list for the remainder of the year. Because GCC's price list was based on a per cubic yard price, GCC's price for its concrete did not decrease with volume. Thus, the level of mark up here for VandeBrake's price-fixing violations did not decline with the volume of commerce involved. Consequently, GCC's unit cost of production should have decreased as production increased, thereby increasing the profits to be drawn from VandeBrake's antitrust activities and increasing the losses to his victims.[40]

---

[40]A basic concept of economics is that unit production costs are substantially affected by changes in production volume. While some costs do not fluctuate with changes

(continued...)

Therefore, there is no basis in this case for the base offense level for VandeBrake's antitrust violations to increase less rapidly than the offense level for comparative fraud violations. The court notes that the volume of commerce in this case, as agreed by the parties, is $5,666,439. The commentary to § 2R1.1 indicates that:

> It is estimated that the average gain from price-fixing is 10 percent of the selling price. The loss from price-fixing exceeds the gain because, among other things, injury is inflicted upon consumers who are unable or for other reasons do not buy the product at the higher prices.

U.S.S.G. § 2R1.1 cmt. 3. Ten percent of the affected volume of commerce in this case is $566,634. Thus, the estimated loss to VandeBrake's victims in this case is more than $566,634. Under such circumstances, the fraud guideline § 2B1.1(b)(1)(H) directs a fourteen level increase because the resulting loss in this case is more than $400,000 but less than $1,000,000. This is substantially more than the meager two point increase called for by § 2R1.1(b)(2)(A) and leads the court to find that application of that section fails to provide a just and reasoned sentencing range given the facts here. Accordingly, the court finds that the "nature and circumstances of the offense," 18 U.S.C. 3553(a)(1), "the need for the sentence imposed-to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), each justify the need for substantial punishment above the guideline sentence and warrants a variance of VandeBrake's sentence above the applicable guideline sentence.

---

[40](...continued)

in production volume, others do. Therefore, because some costs are fixed, there is an inverse relationship between production volume and unit production costs. As the volume of production increases, the unit costs of production typically decrease. Thus, the lowest unit cost of production should be achieved at the maximum attainable capacity of a manufacturing operation.

### b.    The history and characteristics of the defendant

The first § 3553(a) factor also requires the court to consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).  The court has described above, in some detail, VandeBrake's history and characteristics.  VandeBrake is a hard-working man with considerable talent who has worked as a successful executive in the concrete industry for many years.  He had no serious criminal history prior to the instant offenses, has strong family ties, and has otherwise led a lawful life.  What the court finds most disquieting about VandeBrake's history and characteristics is that VandeBrake was already wealthy when he embarked on and engaged in the charged conspiracies.  VandeBrake can make no claim to be a latter-day Jean Valjean, the unemployed protagonist in Victor Hugo's *Les Miserables* who was imprisoned for stealing a loaf of bread to feed his widowed sister's seven children.  As this court recently recognized, "[a] crime of fraud by one who already has more than enough—and who cannot argue that he suffered a deprived or abusive childhood or the compulsion of an expensive addiction—is simply a crime of greed."  *United States v. Miell*, ---F. Supp.2d ---, 2010 WL 3853155, at *49 (N.D. Iowa Sept. 27, 2010).  Nearly as disturbing is the fact that VandeBrake fails to believe    that    he    was    motivated    by    greed.[41]        Instead,

---

[41]This is best exemplified by the following extensive exchange between the court and VandeBrake during his testimony at the sentencing hearing:

| | |
|---|---|
| THE COURT: | I'm sorry, Mr. VandeBrake.  What was your motivation for initially engaging in the antitrust conspiracy in 2006? |
| THE WITNESS: | In 2006? |
| THE COURT: | Right.   That's when the first – that's when the indictment alleges the earliest |

(continued...)

(…continued)

|                |                                                                                                                                                                                                      |
|----------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                | conspiracy.                                                                                                                                                                                           |
| THE WITNESS:   | You know, we had – we had merged, and we had a plant in Sioux Center, and that was, you know, close to Rock Valley, and we wanted, you know, just wanted to get a – you know, get a decent price for our concrete. |
| THE COURT:     | Well, why doesn't the market place determine a decent price for concrete? Why doesn't the free market determine that?                                                                                 |
| THE WITNESS:   | Well, they really do.                                                                                                                                                                                 |
| THE COURT:     | So you really wanted more than a decent price. You wanted to make more money than what the marketplace would allow you to make.                                                                       |
| THE WITNESS:   | No – yeah --well –                                                                                                                                                                                    |
| THE COURT:     | No? No?                                                                                                                                                                                               |
| THE WITNESS:   | Well, yeah, I wanted a fair price for my product.                                                                                                                                                     |
| THE COURT:     | Well, the marketplace doesn't establish a fair price?                                                                                                                                                 |
| THE WITNESS:   | I don't – you know, I didn't think that it was as fair as it should be.                                                                                                                               |
| THE COURT:     | You mean it wasn't as profitable as you wanted it to be.                                                                                                                                              |
| THE WITNESS:   | That's correct.                                                                                                                                                                                       |
| THE COURT:     | Did you take any business at the various schools you attended?                                                                                                                                        |
| THE WITNESS:   | Yeah.                                                                                                                                                                                                 |
| THE COURT:     | Doesn't the free market always determine a fair price?                                                                                                                                                |
| THE WITNESS:   | Yes.                                                                                                                                                                                                  |

(continued…)

(...continued)

| | |
|---|---|
| THE COURT: | But you weren't satisfied with that, were you? |
| THE WITNESS: | You know, honestly I – I – you know, there's a lot of expenses, and – and --, you know, we were down lower, way low. |
| THE COURT: | Well, you had – you personally had a high net worth, didn't you, back in 2006? |
| THE WITNESS: | A high net worth? |
| THE COURT: | Yeah. What do you think your net worth was in 2006? |
| THE WITNESS: | I don't know. I really don't know. |
| THE COURT: | You don't know? |
| THE WITNESS: | Two million? |
| THE COURT: | Okay. Do you realize that that places you in the top one-tenth of 1 percent of all working people in the United States? Do you realize that? |
| THE WITNESS: | I do now. |
| THE COURT: | Okay. So back in 2006 you have a net worth of two million dollars. So your net worth has increased – isn't it ten million now? |
| THE WITNESS: | Something like that, yes. |
| THE COURT: | So you increased your net worth from two million to ten million in four years, and you haven't worked for the last year plus? Is that your testimony? |
| THE WITNESS: | No. I mean, I – |
| THE COURT: | Well, your net worth is – when you filled this out which was several months ago, it was $10,233,000. |
| THE WITNESS: | Well, that's – yeah, that's what it was. |

(continued...)

(...continued)

| | |
|---|---|
| THE COURT: | So it was increased from two million to ten million plus in less than four years. |
| THE WITNESS: | I covered a big territory, though. I – you know, it wasn't just – I didn't make that money, and, you know, that net worth came from the sale of my company. I didn't – |
| THE COURT: | Yeah. So I guess part of what you were doing back in 2006 was to try and increase the value of your company so you could sell it by violating the federal antitrust laws. |
| THE WITNESS: | No. |
| THE COURT: | No. That wasn't your motivation. |
| THE WITNESS: | No. |
| THE COURT: | No. It was just to get a fair price. |
| THE WITNESS: | Yeah. |
| THE COURT: | Okay. |
| THE WITNESS: | Yeah. |
| THE COURT: | It wasn't greed. |
| THE WITNESS: | No. |
| THE COURT: | It wasn't greed. |
| | |
| THE WITNESS: | Well, you know, I'd be lying if I said I didn't want to make money. |
| THE COURT: | Well, you told me before you weren't a liar. So was it greed or wasn't it greed? What's difficult about that question? Were you being greedy trying to violate the antitrust laws or not? |
| THE WITNESS: | You know, I think – I'm not – if I were to tell you that I didn't want to make more money and that I wasn't going to |

(continued...)

83

(...continued)

|                |                                                                                                                                                                                                                                                                                                                                                                                            |
| -------------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------ |
|                | make more money, I'd be lying. But, you know, we have equipment. We have employees. We have health insurance and, you know –                                                                                                                                                                                                                                                               |
| THE COURT:     | So that justifies violating the federal antitrust laws?                                                                                                                                                                                                                                                                                                                                    |
| THE WITNESS:   | No, it doesn't.                                                                                                                                                                                                                                                                                                                                                                            |
| THE COURT:     | Well, under your theory every company has overhead. Can you name me a single company that doesn't have some overhead?                                                                                                                                                                                                                                                                      |
| THE WITNESS:   | No, sir.                                                                                                                                                                                                                                                                                                                                                                                   |
| THE COURT:     | So, under your theory every company in the United States would be entitled to violate the federal antitrust laws to make more money and get a, quote, fair price.                                                                                                                                                                                                                          |
| THE WITNESS:   | No, sir.                                                                                                                                                                                                                                                                                                                                                                                   |
| THE COURT:     | Well, then explain it to me.                                                                                                                                                                                                                                                                                                                                                               |
| THE WITNESS:   | I was wrong.                                                                                                                                                                                                                                                                                                                                                                               |
| THE COURT:     | Well, it's only wrong because you got caught, and you only got caught because the government has a leniency program. You'd still be violating the antitrust laws today if you hadn't gotten caught in my opinion, wouldn't you? Why would you have stopped? You didn't stop after you sold the company. Explain that one to me. Why didn't you stop after you sold the company?               |
| THE WITNESS:   | You know, I can't explain that to you.                                                                                                                                                                                                                                                                                                                                                     |
| THE COURT:     | You didn't think I was going to ask you that?                                                                                                                                                                                                                                                                                                                                              |
| THE WITNESS:   | Yeah, I did.                                                                                                                                                                                                                                                                                                                                                                               |

(continued...)

[41](...continued)

| | |
|---|---|
| THE COURT: | And you have no explanation whatsoever? |
| THE WITNESS: | No. I just, you know. . . |
| THE COURT: | You just violated federal law for the hell of it? |
| THE WITNESS: | No. |
| THE COURT: | Well, then why'd you do it? |
| THE WITNESS: | Well, I – trying to get along. |
| THE COURT: | Trying to get along. |
| THE WITNESS: | With the comp – yeah, I'm just, you know, trying to, you know. . . |
| THE COURT: | A $10 price increase is trying to get along with the competition? That's your definition of trying to get along? |
| THE WITNESS: | I – I – you know, I just tried to – I tried to get a decent price. I tried to get – |
| THE COURT: | A decent price. You tried to get an illegal price. And you're telling me an illegal antitrust fixing price is what it takes to get a decent price in your industry? |
| THE WITNESS: | I don't have – |
| THE COURT: | Pardon me? |
| THE WITNESS: | I don't have much to say about that. You know, I – |
| THE COURT: | Well, do you think you were greedy? |
| THE WITNESS: | I – no. |
| THE COURT: | No. No. You weren't greedy. |
| THE WITNESS: | Competitive but . . . |
| THE COURT: | Competitive. |
| THE WITNESS: | Yeah. Well, you know, I – |
| THE COURT: | Competitive? |
| THE WITNESS: | You know, I – |
| THE COURT: | It's the antithesis – it's the opposite of |

(continued...)

VandeBrake continues to justify and rationalize his conduct.  He excuses his criminal

---

[41](...continued)

|  | being competitive. |
| THE WITNESS: | Yeah. |
| THE COURT: | To fix prices, isn't it? |
| THE WITNESS: | Yes. |
| THE COURT: | So how can you tell me you were competitive?  You were a cheater.  You were a thief.  That's not being competitive.  Is it?  Is that your definition of competitive?  Is that what they teach you in church?  Is that your definition of competitive? |
| THE WITNESS: | No, sir. |
| THE COURT: | Well, then what did you mean when you say you were being competitive? |
| THE WITNESS: | It was a poor choice of words I guess.  I'm not – I wasn't being competative. |
| THE COURT: | You were stealing other people's money. |
| THE WITNESS: | Well – |
| THE COURT: | You don't think you were stealing. |
| THE WITNESS: | No, I think they got a great product for a good price.  They got a fantastic product. |
| THE COURT: | So I'm just trying to understand, Mr. VandeBrake, what you're saying.  You justify three separate criminal conspiracies to violate the Sherman Act because you were selling a great product for a good price. |
| THE WITNESS: | (Witness nodded head.) |
| THE COURT: | Court reporter can't take down a nod of the head, so you'll have to answer audibly. |
| THE WITNESS: | Yes. |

Sentencing Tr., Vol. 1 at 244-51.

conduct by reasoning that he gave GCC's customers a "great product for a good price." Sentencing Tr., Vol. 1 at 251. VandeBrake's self-serving rationalizations reflect a total lack of remorse for his criminal conduct in his case. Also, it has not escaped the court's attention that VandeBrake initiated the conspiracies charged in Counts 1 and 3. Thus, he cannot claim to have been unwittingly duped into joining and participating in those charged conspiracies. Equally troubling is the fact that VandeBrake is one of the few white collar defendants I have sentenced where the sentencing record is totally devoid of *any* community work, participation in any service organizations, or charitable giving. There is no record evidence of even a single good deed done by VandeBrake for anyone other than his family. VandeBrake makes a mockery of the adage that "to whom much is given, much is expected."

Thus, the court finds that VandeBrake's history and characteristics warrant more significant punishment than the advisory guidelines might mete out, despite VandeBrake's lack of prior criminal history. Instead, these factors warrant a variance of VandeBrake's sentence above the applicable guideline sentence.

c.      *The kinds of sentences available*

The third § 3553(a) factor that the sentencing court must consider is "the kinds of sentences available," *see* 18 U.S.C. § 3553(a)(3), and the fourth factor is "the kinds of sentence and the sentencing range established" for similar offenses. 18 U.S.C. § 3553(a)(4). A comparison between VandeBrake's advisory antitrust offense guideline sentence and the advisory guideline sentence he would face if charged with fraud offenses further supports the court's view that VandeBrake is deserving of an upward variance in his sentence.

In comparing the volume of commerce referenced in §2R1.1 with loss, as referenced in U.S.S.G. §2B1.1, the court has considered loss to be equal to 10 percent of

the affected volume of commerce.  *See* U.S.S.G. §2R1.1, cmt. n.3.   The Base Offense Level under U.S.S.G.   §2B1.1(a)(2) is six when the statutory maximum term of imprisonment is less than 20 years.   The volume of commerce in VandeBrake's case is $5,666,348.61.   Ten percent of the affected volume of commerce in his case is $566,634.   Therefore, using $566,634 as the loss amount, U.S.S.G. §2B1.1(b)(1)(H) directs the court to apply a 14-level increase when the loss amount is more than $400,000 but less than $1,000,000.   U.S.S.G. §2B1.1(b)(2)(A)(i) further directs that if the offense involved 10 or more victims, increase by 2 levels.   The record in VandeBrake's case supports a finding that his offenses involved at least 13 victims, thereby supporting the 2 level increase.   U.S.S.G. §3B1.1(a) directs that, if the defendant was an organizer or a leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.   VandeBrake initiated separate anticompetitive conversations with VanZee of Tri-State and CW-1 and CW-2 of Siouxland.   He further directed GCC sales representatives, Duane Nippert, David Bierman, Ryan Lake, and Lee Konz to abide by the price lists agreed to by him and co-conspirator concrete companies when dealing with GCC customers.   Thus, a four level increase would be called for in VandeBrake's case.   Therefore, his adjusted offense level would be 26.   After subtracting three points for acceptance of responsibility, *see* U.S.S.G. §§ 3E1.1(a)-(b), VandeBrake's adjusted offense level is 23.   Because no further enhancements are called for, VandeBrake's total offense level would remain at 23.   A Total Offense Level 23 and Criminal History Category I establishes that VandeBrake's advisory guideline range would be 46 to 57 months, or roughly twice the advisory guideline sentence called for under antitrust guideline § 2R1.1.   Because the social utility of the Sherman Act in preventing price-fixing agreements would appear to be at least as great as that offered by fraud statutes, these factors supports an upward variance in VandeBrake's sentence.

### d.     Any pertinent policy statement

The fifth § 3553(a) factor is "any pertinent policy statement." 18 U.S.C. § 3553(a)(5). In determining VandeBrake's sentence, the court takes into account the Sentencing Commission's view "that alternatives such as community confinement not be used to avoid imprisonment of antitrust offenders." U.S.S.G. § 2R1.1, cmt. n. 5. The Guidelines reflect a considered determination by the Sentencing Commission that terms of incarceration are viewed as the most effective deterrent for antitrust violations. *See id.* § 2R1.1 cmt. background (stating that "in very few cases will the guidelines not require that some confinement be imposed"). The Sentencing Commission has further explained that terms of imprisonment are ordinarily necessary for antitrust violations because they "reflect the serious nature of and the difficulty of detecting such violations." Amendments to the Sentencing Guidelines for United States Courts, 56 Fed. Reg. 22,762, 22,775 (May 16, 1991). The pertinent policy statements favor VandeBrake's being sentenced to a period of incarceration.

### e.     Avoiding unwarranted sentencing disparities

The sixth § 3553(a) factor is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). A concomitant of this principle is the need to avoid *unwarranted similarities* among defendants who are *not* similarly situated. *See, e.g., Gall*, 552 U.S. at 55 ("[I]t is perfectly clear that the District Judge considered the need to avoid unwarranted disparities, but also considered the need to avoid unwarranted similarities among other co-conspirators who were not similarly situated," and there was no procedural error in doing so). The Eighth Circuit Court of Appeals has noted that "' § 3553(a)(6) may more appropriately apply to disparities [in general] on a national level and not within the same conspiracy,. . . .'" *United States v. Pepper,* 486 F.3d 408, 413 n. 2 (8th Cir.

89

2007) (quoting *United States v. Kane,* 470 F.3d 1277, 1281 (8th Cir. 2006) (citations omitted)); *see United States v. Ball,* 499 F.3d 890, 900 n. 3 (8th Cir. 2007). *But see United States v. Krutsinger,* 449 F.3d 827, 830 (8th Cir. 2006) (concluding district court committed no abuse of discretion when it considered sentencing disparity between two defendants who committed the same crime in the same conspiracy). Other federal circuit courts of appeals have similarly concluded that § 3553(a)(6) is concerned with national uniformity as opposed to uniformity of co-defendant's sentences. *See United States v. Frias,* 521 F.3d 229, 236 (2d Cir. 2008); *United States v. Simmons,* 501 F.3d 620, 622 (6th Cir. 2007); *United States v. Parker,* 462 F.3d 273, 277 (3d Cir. 2006); *United States v. Candia,* 454 F.3d 468, 476 (5th Cir. 2006); *United States v. Pisman,* 443 F.3d 912, 916 (7th Cir. 2006); *United States v. Fernandez,* 443 F.3d 19, 31-32 (2d Cir. 2006).

A nationwide survey of sentences for Sherman Act antitrust violations of 15 U.S.C. § 1 reveals few published decisions since passage of the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 more than tripled the maximum penalties for individuals from a possible term of imprisonment of three years to ten years.[42]  *See* Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, 118 Stat. 665 (2004). The likely reason for so few published decisions is binding plea

---

[42] In the early 1970's 8 percent of price-fixing convictions resulted in a jail term and, even then, the average term of incarceration was only 44 days. *See* Gregory J. Werden, *Sanctioning Cartel Activity: Let the Punishment Fit the Crime*, Eur. Competition J. (publication forthcoming), http://www.usdoj.gov/atr/public/articles/240611.htm (last visited January 13, 2011) (discussing early prison sentences under the Sherman Act). The United States Justice Department reports on its web site that by 2010, both of those figures had increased dramatically over the proceeding four decades. In 2010, 78 percent of defendants convicted of Sherman Act violations received sentences that included a period of incarceration and the average period of incarceration was 30 months. *See* http://www.justice.gov/atr/public/criminal/264101.html (last visited January 13, 2011).

agreements, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), entered into between defendants charged with Sherman Act violations and Antitrust Division prosecutors. A review of those few published decisions reveals sentences both more substantial than the court is considering here as well as sentences far more lenient than the court is contemplating to impose here. *Compare United States v. Green*, 592 F.3d 1057, 1071 (9th Cir. 2010) (upholding 90 month sentence) *with United States v. Beaver*, 515 F.3d 730, 737 (7th Cir. 2008) (27 month sentence), *United States v. Rose*, 449 F.3d 627, 629 (5th Cir. 2006) (reversing 30 month sentence under prior version of § 2R1.1 because evidence was insufficient to support five-level enhancement), and *United States v. Rattoballi*, 276 Fed. App'x 99 (2nd Cir. 2008) (affirming sentence of 18 months imprisonment under prior version of § 2R1.1). VandeBrake's conduct in this case most closely resembles that in *Beaver*, where the defendant also was embroiled in a price-fixing conspiracy involving concrete competitors. *See Beaver*, 515 F.3d at 732-34. However, because the defendant in *Beaver* did not appeal his sentence, but rather challenged the sufficiency of the evidence to sustain his convictions, the opinion provides insufficient detail for the court to determine whether the underlying facts of that decision are comparable to VandeBrake. The other three decisions all involve circumstances that are plainly distinguishable from the antitrust conspiracies here. For example, the defendant in *Green* was convicted not only on nine counts of bid rigging and one count of conspiracy to commit bid rigging but also eleven counts of wire fraud and one count of conspiracy to commit wire and mail fraud. *Green*, 592 F.3d at 1060. Moreover, the loss involved in *Green*, concerning bilking the federal government out of almost $60 million, is considerably higher than in this case. *Id.*

Accordingly, while the sentence the court is contemplating for VandeBrake is higher than some recent sentences imposed for violations of the same statute, the court

nevertheless concludes that the contemplated sentence it will impose is appropriate to avoid *unwarranted similarities* among defendants who are *not* similarly situated. *See, e.g., Gall*, 552 U.S. at 55. Moreover, I appear to be the first federal judge to consider varying upward from the Sentencing Guidelines based on my policy disagreements with the Sentencing Guidelines's relatively lenient treatment of antitrust violations when compared to fraud sentences. This action, by changing the status quo of antitrust sentences, will understandably result in a sentencing disparity between the defendants here and those sentenced previously. However, the sentencing disparity created here is not an unwarranted disparity. To the contrary, the disparity is entirely warranted in order to reflect the seriousness that Sherman Act violations pose to the well-being of the nation.

### f.    *Remaining § 3553(a) factor*

The remaining § 3553(a) factor—"the need to provide restitution to any victims of the offense," § 3553(a)(7)—does not lead the court to a contrary conclusion. No customers of VandeBrake have submitted a request for restitution. In the circumstances of this case, this factor is, at best, neutral.

Our society as a whole is damaged when free and unfettered competition is prevented by Sherman Act violations. While the court notes that "restitution" to society in general is not possible in a Sherman Act case, the concept of restitution is still a factor to consider in such a case. The court believes that VandeBrake should make "restitution" in the form of community service to members of society who have all suffered indirectly from his crime. To that end, VandeBrake must complete 500 hours of community service, at a rate of not less than 25 hours per month.

### g.    *Fine*

The special fine instruction at § 2R1.1(c)(1) provides that: "[f]or an individual, the guideline fine range shall be from one to five percent of the volume of commerce, but not

less than $20,000." This special instruction takes precedence over the general guideline found at § 5E1.2(b). *See* U.S.S.G. 5E1.2(b) ("If, however, the guideline for the offense in Chapter Two provides a specific rule for imposing a fine, that rule takes precedence over subsection (c) of this section."). As a result, the guideline fine range for VandeBrake is limited to a minimum of one percent of the volume of commerce and a maximum of five percent of the volume of commerce. The court finds the fine authorized by § 2R1.1(c)(1) is woefully inadequate.

In determining what fine to impose here, the court considers VandeBrake's income; earning capacity; financial resources; the burden on VandeBrake and his dependents; pecuniary loss inflicted on others as a result of the offense; whether restitution is ordered; the need to deprive VandeBrake of illegal gains; the expected costs of VandeBrake's imprisonment and supervised release; and the need to promote respect for the law, provide just punishment, and adequate deterrence. *See* 18 U.S.C. § 3572(a); U.S.S.G. § 5E1.2(d).[43] The background commentary to the § 2R1.1 indicates that "[s]ubstantial fines are an essential part of the sentence." U.S.S.G. 2R1.1 cmt. background. Section 2R1.1, however, offers no guidance on when an upward variance might be warranted. The comments to § 5E1.2, on the other hand, indicate that an upward "departure" may be warranted where two times the amount of loss resulting from the offense exceeds the maximum guideline fine. U.S.S.G. § 5E1.2, comment 4. In VandeBrake's case, the court has determined that the resulting loss was approximately $566,634. Inasmuch as two times

---

[43] The court notes that 18 U.S.C. § 3572(a) and U.S.S.G § 5E1.2(d) list slightly different factors. To the extent they conflict, the court has followed the factors listed in § 3572(a) since statutes prevail over conflicting Guidelines. *See United States v. Butler,* 207 F.3d 839, 850 (6th Cir. 2000) ("When the Commission's interpretation, as embodied in a guideline, does not square with clear Congressional intent, courts will not apply that guideline.").

$566,634 equals $1,133,286 and $1,133,286 exceeds the maximum recommended fine under § 2R1.1(c)(1) of $283,321.50, the court is well within its discretion to vary upward. The court finds that a $829,715.85 fine on Vandebrake is warranted, which represents fifteen percent of the volume of commerce done by him in goods and services that were affected by his violations of 15 U.S.C. § 1. The court notes that U.S.S.G. § 5E1.2(d) specifically instructs that: "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." The court further notes that the commentary to § 2R1.1 indicates that the average gain is equal to 10 percent of the selling price but the loss is greater than that because of the injury to those customers who are unable to buy the product. U.S.S.G. § 2R1.1 cmt. 3. Thus, the loss caused by VandeBrake's action here is more than ten percent of volume of commerce done by him. Accordingly, the court has chosen fifteen percent of the volume of commerce done by VandeBrake in goods and services because that amount is sufficient to make the fine punitive.

Finally, the court notes that in determining the amount of VandeBrake's fine, it must consider, *inter alia*, VandeBrake's "income, earning capacity, and financial resources" as well as "the need to deprive the defendant of illegally obtained gains from the offense." 18 U.S.C. § 3572(a)(1), (5); *see* U.S.S.G. § 5E1.2(d)(2). VandeBrake is an extremely wealthy individual, with a net worth over $10,000,000. VandeBrake's wealth and assets are particularly pertinent to consider in determining the proper amount of his fine because a $829,715.85 fine, while in the abstract is a large sum of money, is quite modest when compared to VandeBrake's overall wealth. Only by imposing a fine of such a large amount does the fine become sufficiently proportionate to VandeBrake's wealth to properly reflect the gravity of his offenses. Given VandeBrake's wealth, the court finds that a $829,715.85 fine is appropriate in order to ensure that it is "sufficient

to ensure that the fine, taken together with other sanctions imposed, is punitive." U.S.S.G. § 5E1.2(d)(2); *see United States v. Koestner*, ---F.3d---, 2010 WL 5185833, at *1 (8th Cir. Dec. 23, 2010)(affirming the imposition of a $100,000 fine which was $70,000 above the advisory guidelines range where the defendant was a "millionaire" and such a fine was appropriate to ensure that the sentence was punitive to the defendant).

### h.    *Summary*

After considering the  § 3553(a) factors, the court finds that an upward variance from the greatest advisory guidelines sentencing range of 21 to 27 months to 48 months is warranted for VandeBrake.  In light of its analysis of the § 3553(a) factors above, the court finds that a sentence of 48 months of imprisonment and a fine of $829,715.85 is appropriate and, therefore, is sufficient, but not greater than necessary, to accomplish the goals of sentencing.

### i.    *Alternative sentence of imprisonment*

Alternatively, if the court did not vary upward, the court would impose sentences of 27 months on each Count; with 27 months of the sentence on Count 3, 15 months of the sentence on Count 1, and 3 months of the sentence on Count 2 running consecutively; for a total sentence of 48 months imprisonment.

In fashioning this alternative sentence, the court recognizes that under 18 U.S.C. § 3584(a), when multiple terms of imprisonment are imposed at the same time, the sentences run concurrently "unless the court orders or the statute mandates that the terms are to run consecutively."  In determining whether sentences of imprisonment are to run concurrently or consecutively, the court must consider "the factors set forth in 18 U.S.C. § 3553(a)." 18 U.S.C. § 3584(b); *see United States v. Lone Fight*, 625 F.3d 523, 525-26 (8th Cir. 2010);  *United States v. Jarvis*, 606 F.3d 552, 553-54 (8th Cir. 2010); *United States v. Rutherford*, 599 F.3d 817, 821 (8th Cir.), *cert. denied*, 131 S. Ct. 349 (2010).

Moreover, U.S.S.G. § 5G1.2(c) provides for multiple sentences to run concurrently "[i]f the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment."[44] If such sentence is inadequate, "then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." U.S.S.G. § 5G1.2(d).

The court understands that § 5G1.2 does not call for consecutive sentences in VandeBrake's case because the advisory guideline range of 21 to 27 months' imprisonment does not exceed the statutory maximum sentence of 120 months imprisonment for each count. Nevertheless, the Eighth Circuit Court of Appeals recently held in *Lone Fight* that:

> the advisory guidelines are not the exclusive basis for imposing consecutive sentences for multiple counts of conviction. Even if the guidelines do not recommend that sentences run consecutively, the district court has broad statutory authority, pursuant to 18 U.S.C. § 3584, to impose consecutive terms.

*Lone Fight*, 625 F.3d at 525; *see Jarvis*, 606 F.3d at 554 (holding that "the guidelines do not control whether sentences run concurrently or consecutively."); *Rutherford,* 599 F.3d at 821 (noting that "§ 5G1.2 does not describe the only time a court may impose consecutive sentences.").

Here, the court has considered VandeBrake's advisory guidelines sentencing range of 21 to 27 months of imprisonment for each of his three antitrust offenses and has taken into account each of the § 3553(a) factors. In light of its analysis of the § 3553(a) factors

---

[44] "'Total punishment' means 'the precise sentence determined by the sentencing judge from within the appropriate guidelines range.'" *Lone Fight*, 625 F.3d at 525 (quoting *United States v. Ervasti*, 201 F.3d 1029, 1045-46 (8th Cir. 2000); *see Rutherford,* 599 F.3d at 820 (quoting *Ervasti*, 201 F.3d at 1045-46).

discussed above, particularly "the nature and circumstances of the offense," "the history and characteristics of the defendant," and "the need for the sentence imposed," the court finds that a sentence of 27 months on each Count is appropriate; with all 27 months of the sentence on Count 3, 15 months of the sentence on Count 1, and 6 months of the sentence on Count 2 running consecutively; for a total sentence of 48 months imprisonment, is sufficient, but not greater than necessary, to accomplish the goals of sentencing.

### 3. *Defendant Stewart*

After balancing the § 3553(a) factors, the court finds that an advisory guidelines sentence of 12 to 18 months for Stewart is adequate to accomplish the goals of sentencing, and that a sentence of 12 months and a day, is a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing. 18 U.S.C. § 3553(a). The court is not required to recite its consideration of each of the § 3553(a) factors. *See Powills*, 537 F.3d at 950. Nonetheless, in the circumstances of this case,

the court provides the following recitation of the court's consideration of each of the § 3553(a) factors which more than adequately provide justification for the sentence imposed.

### a. *The nature and circumstances of the offense/need for sentence*

As discussed above, because the first § 3553(a) factor, "the nature and circumstances of the offense" and the second § 3553(a) factor, "the need for the sentence imposed," largely overlap, they will be discussed together. *See Irey*, 612 F.3d at 1198. In considering the "the nature and circumstances" of Stewart's offense, *see* 18 U.S.C. § 3553(a)(1), the court is struck by both the banality of Stewart's illegality as well its seriousness. The banality of Stewart's colluding on the price for ready-mix concrete and rigging bids for it masks the seriousness of his illegal endeavors. Stewart's crime strikes right at the heart of our free and fair enterprise system, the integrity of the market. As

discussed above, the subject of Stewart's criminal conspiracy, ready-mix concrete, is a necessity for the construction of a wide array of both commercial and non-commercial projects. As a result, those businesses, local governments, and individual consumers with projects requiring ready-mix concrete look to the marketplace to obtain it. However, due to the travel limitations on ready-mix concrete, the victims of Stewart's conspiracy had substantially fewer or, in some instances, no market options but to purchase concrete from Stewart or his co-conspirator. Consequently, Stewart's actions, in using his company's position in the concrete industry to exploit its customers, corrupts our free enterprise system and, in general, undermines our way of life by causing systemic harm to competition and the market.

Considering the circumstances of this case, the court finds that the 1-level enhancement of Stewart's advisory guidelines sentence pursuant to U.S.S.G. § 2R1.1(b)(1), for participating in an agreement to submit non-competitive bids, utterly fails to correlate to the nature and extent of the harm that Stewart's conspiratorial actions inflicted on his company's customers who were literally forced to accept Stewart or his co-conspirator's rigged bids for the concrete required for their projects. *See White*, 506 F.3d at 645.

In considering the second § 3553(a) factor, "the need for the sentence imposed," § 3553(a)(2), the court finds that the flaw in U.S.S.G. § 2R1.1(b)(2), discussed above, causes application of that section to provide a slightly inaccurate sentencing range for Stewart and one which the court does not believe warrants a variance. The assumption that the level of mark up from an antitrust violation tends to decline with the volume of commerce involved is incorrect in Stewart's case. Great Lakes, like GCC, established a price list for its concrete sales early in 2009 and used that price list for its sales for the remaining period of the conspiracy. Since Great Lakes's price list was based on a per

cubic yard price for its concrete, its price for its concrete did not decrease with volume. Accordingly, Great Lakes's level of mark up for its concrete did not decline with the volume of commerce involved. Therefore, there is no basis in Stewart's case for the base offense level for his antitrust violations to increase less rapidly than the offense level for comparative fraud violations. The court notes that the volume of commerce in Stewart's case is $1,668,541.90. The commentary to § 2R1.1 indicates that:

> It is estimated that the average gain from price-fixing is 10 percent of the selling price. The loss from price-fixing exceeds the gain because, among other things, injury is inflicted upon consumers who are unable or for other reasons do not buy the product at the higher prices.

U.S.S.G. § 2R1.1 cmt. 3. Ten percent of the affected volume of commerce in this case is $166,854. Thus, the estimated loss to Stewart's victims in this case is less than $200,000. Under such circumstances, the fraud guideline § 2B1.1(b)(1)(F) directs a ten level increase because the resulting loss in this case is more than $120,000 but less than $200,000. This is five times the two point increase called for by § 2R1.1(b)(2)(A). However, because the fraud guideline begins at a level six, six levels below that starting point of the antitrust guideline, the court finds that application of § 2R1.1(b)(2)(A) provides a just and reasoned sentencing range for Stewart given the facts of his case. Therefore, the court finds that the "nature and circumstances of the offense," and the "the need for the sentence imposed," each justify a punishment within the guideline sentencing range.

### b. *The history and characteristics of the defendant*

Under the first § 3553(a) factor, the court must also consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Stewart's history and characteristics were described above in detail. Stewart has successfully worked in the

concrete industry for nearly thirty years. Since 2004, he has been the president, general manager and part owner of Great Lakes. Stewart had no serious criminal history before the current charge, has strong family ties, and has led a productive life. Indeed, his career in the cement industry has provided him with a comfortable life in which he has accumulated more than four million dollars in assets. Despite living the American dream, Stewart chose to involve himself in the charged criminal conspiracy. The court, however, finds that Stewart's involvement in the charged offense was not motivated solely by greed. To be sure, ensuring the profitability of his company was the driving concern to him. Stewart, however, did not seek his company's continued profitability as means to benefit only himself. Rather, he saw his company's continued profitability as a way of ensuring the jobs and livelihood of his employees in the face of competition from the subsidiary of a multi-national, conglomerate. Thus, because the court finds that Stewart's crime was not one of pure greed, there is no special need for general deterrence of his crime and the dangers it posses to our society. Thus, the court finds that Stewart's history and characteristics do not warrant a variance from the applicable advisory guideline sentence.

### c.    *The kinds of sentences available*

The court turns next to consider the third § 3553(a) factor, "the kinds of sentences available," *see* 18 U.S.C. § 3553(a)(3), and the fourth § 3553(a) factor, "the kinds of sentence and the sentencing range established" for similar offenses. 18 U.S.C. § 3553(a)(4). Comparing Stewart's antitrust offense guideline sentence with the guideline sentence he would have if his sentence was calculated using the sentencing guidelines for fraud offenses does not support an upward variance in Stewart's sentence.

In comparing the volume of commerce referenced in §2R1.1 with loss as referenced in §2B1.1, the court has again considered loss to be equal to 10 percent of the affected volume of commerce. *See* U.S.S.G. §2R1.1, cmt. n.3. Stewart's Base Offense Level

under U.S.S.G. §2B1.1(a)(2) is six since the statutory maximum term of imprisonment is less than 20 years.  The Volume of Commerce in Stewart's case is $1,668,541.90.  Ten percent of the affected volume of commerce in this case is $166,854.  U.S.S.G. §2B1.1(b)(1)(F) directs that a 10-level increase be assessed when the loss amount is more than $120,000 but less than $200,000.  U.S.S.G. §2B1.1(b)(2)(A)(i) further directs that if the offense involved 10 or more victims, increase by 2 levels. The record here fully supports a finding that Stewart's offenses involved 10 or more victims and supports the 2 level increase.  Therefore, his adjusted offense level would be 18.  Because a two level reduction for acceptance of responsibility is called for in Stewart's case, his adjusted offense level is 16.  Because no further enhancements are called for, Stewart's total offense level would remain at 16.  A Total Offense Level 16 and Criminal History Category I establishes that Stewart's advisory guideline sentencing range would be 21 to 27 months.  Slightly more than the advisory guideline sentence called for under § 2R1.1.  As discussed above, since the societal benefits of the Sherman Act would appear to be at least as great as that offered by fraud statutes, these factors slightly support an upward variance in Stewart's sentence.

### d. *Any pertinent policy statement*

In determining Stewart's sentence, the court next considers "any pertinent policy statement," the fifth § 3553(a) factor.  18 U.S.C. § 3553(a)(5).  As discussed above, the court notes the Sentencing Commission's view that incarceration is deemed the most effective deterrent for antitrust violations because such sentences reflect both the seriousness of the violation and difficulty posed by its detection.  *See id*. § 2R1.1 cmt. background;  Amendments to the Sentencing Guidelines for United States Courts, 56 Fed. Reg. 22,762, 22,775 (May 16, 1991).   Accordingly, the  pertinent policy statements weigh in favor of Stewart being sentenced to a period of incarceration.

### e.  *Avoiding unwarranted sentencing disparities*

The court next considers the sixth § 3553(a) factor, "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  As the court explained above, there is a dearth of published decisions since passage of the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 significantly increased the maximum penalties for antitrust violations.  The court's consideration of this factor is further complicated by the fact that those few decisions available for review either provide insufficient details which would permit the court to compare the underlying facts of those decisions with Stewart's case or involve plainly distinguishable circumstances from the antitrust conspiracy involving Stewart.  As the court noted above, § 3553(a)(6) is primarily focused on mitigation of national disparities between similarly situated defendants.  *See Pepper,* 486 F.3d at 413 n. 2; *Kane,* 470 F.3d at 1281; *Ball,* 499 F.3d at 900 n. 3; *see also Simmons*, 501 F.3d at 622; *Parker,* 462 F.3d at 277; *Candia,* 454 F.3d at 476; *Pisman,* 443 F.3d at 916; *Fernandez,* 443 F.3d at 31-32.  Nonetheless, Eighth Circuit precedent *permits,* but does not require, the court to consider gross disparities in sentences between co-defendants, even if it is not the primary goal of that sentencing provision.  *See Kane,* 470 F.3d at 1281 (holding district court did not abuse its discretion in considering intra-conspiracy disparity); *Krutsinger,* 449 F.3d at 829-30 ("We cannot say the district court abused its discretion in fashioning a sentence that attempted to address the disparity in sentences between two nearly identically situated individuals who committed the same crime in the same conspiracy."); *see also United States v. Vázquez-Rivera,* 470 F.3d 443, 449 (1st Cir. 2006) ("[A] district court may consider disparities among co-defendants in determining a sentence . . . ."); *United States v. Wills,* 476 F.3d 103, 110 (2d Cir. 2007) ("We do not, as a general matter, object to district courts' consideration of similarities and differences

among co-defendants when imposing a sentence."); *United States v. Parker,* 462 F.3d 273, 277 (3d Cir. 2006) (holding that a district court is permitted, although not required, to consider sentencing disparities among co-defendants).

Unsurprisingly, the case the court has found to present the closest factual analogue to Stewart's case is VandeBrake's case. Stewart was a co-conspirator with VandeBrake in one of the three antitrust price-fixing conspiracies VandeBrake is charged with participating in. VandeBrake and Stewart each conspired to price fix and rig bids on concrete sold by their companies. Both Stewart and VandeBrake have similar backgrounds in the concrete industry, each rising to an executive position in a concrete company. Like VandeBrake, Stewart has become wealthy by his involvement in the concrete industry and had no economic need to engage in criminal conduct. Like VandeBrake, Stewart has no criminal history, resulting in a criminal history category of I. The court further finds that the family support for these two defendants is comparable. However, there are significant differences between VandeBrake and Stewart which warrant Stewart receiving a lesser sentence. Stewart was only involved with VandeBrake in a single conspiracy concerning two concrete companies while VandeBrake was involved in three conspiracies embroiling four concrete companies throughout northwest Iowa. Thus, VandeBrake was the puppet master of a wide ranging concrete cartel he created and organized. Significantly, the court finds that VandeBrake's criminal actions were ones of pure greed, not necessitated in the least by either need or circumstances, and viewed as a means to obtain material goods and provide an opulent lifestyle. Stewart's motivations were not purely monetary. Albeit seriously misguided, Stewart sought to ensure his company's continued profitability as a means to benefit not only himself, but the jobs and livelihood of his employees in the face of what Stewart viewed was the unfair competition posed by VandeBrake and GCC. Moreover, the volume of commerce effected by Vandebrake, $5,666,348.61, is over three

times the level effected by Stewart's actions, $1,668,541.90. Finally, VandeBrake initiated two of the three conspiracies in which he was involved and may well have initiated the conspiracy with Stewart. Thus, the court finds that avoidance of unwarranted sentencing disparities among similarly situated defendants pursuant to 18 U.S.C. § 3553(a)(6), and avoidance of *unwarranted similarities* among defendants who are *not* similarly situated, *see Gall*, 128 S. Ct. at 600, supports a sentence for Stewart of 12 months and a day imprisonment.


### f.    The need to provide restitution

The final § 3553(a) factor is "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). Only one customer of Stewart, Tri-Zack Contractor, has submitted a restitution request. The volume of commerce attributable to Stewart on Tri-Zack Contractor's project is $259,818. The prosecution argues that the appropriate amount of restitution should be no less than 10 percent of the volume of commerce of that project, $25,981.80. Stewart counters that if Tri-Zack had obtained a bid for and purchased its concrete from American Concrete, a concrete manufacturer in Emmetsburg, Iowa, which was uninvolved in any of the antitrust violations involved here, it would have saved only $419.00. The flaw in Stewart's argument is that it is based on a fiction-namely it assumes the price set by American Concrete reflects the true market price for the concrete Tri-Zack purchased. The court is unwilling to make that assumption. It is altogether possible that if Stewart had not rigged the bid for the Milford project, the project involving Tri-Zack, Tri-Zack might have been able to purchase the concrete it used at substantially lower prices than that offered by American Concrete. Accordingly, the court finds that the appropriate restitution amount is 10 percent of the volume of commerce

of that project, $25,981.80. Therefore, Stewart is ordered to pay restitution to Tri-Zack Contractor in the sum of $25,981.80. In the circumstances of Stewart's case, this factor is neutral.

As the court noted above, society in general is damaged when free and unfettered competition is prevented by Sherman Act violations. Although "society" is not a "victim," as defined in 18 U.S.C. § 3662A(a)(2), the concept of "restitution" to society for Sherman Act violations is still a factor to consider in such a case. The court believes that Stewart should make "restitution" in the form of community service to members of society who have all suffered indirectly from his crime. To that end, Stewart must complete 100 hours of community service, at a rate of not less than 20 hours per month.

### g.    *Fine*

The special fine instruction found in § 2R1.1(c)(1) results in a advisory guidelines fine range for Stewart between a minimum of one percent of the volume of commerce and a maximum of five percent of the volume of commerce. The court finds that a $83,427.09 fine for Stewart to be justified here, which represents five percent of the volume of commerce done by him in goods and services that were affected by his violations of 15 U.S.C. § 1. The court has chosen to levy a five percent fine on Stewart instead of a fifteen percent fine, as it has imposed on VandeBrake, in order to properly reflect the proportionate heightened severity of VandeBrake's actions resulting from his involvement in three separate conspiracies. In addition, the court has taken into account the fact that because VandeBrake is much wealthier than Stewart, VandeBrake's fine needs to be significantly higher in order to ensure that his fine, when taken together with the other sanctions imposed, is punitive.

### h.    *Summary*

After considering the § 3553(a) factors, the court finds that an upward variance from the advisory guidelines sentencing range of 12 to 18 months is unwarranted for Stewart and that a sentence of 12 months and a day of imprisonment and a fine of $83,427.09 is sufficient, but not greater than necessary, to accomplish the goals of sentencing.

## III. CONCLUSION

### A. VandeBrake

With respect to defendant VandeBrake, for all of the reasons stated above, upon a consideration of the totality of the circumstances, in light of the 18 U.S.C. § 3553(a) factors—and particularly considering "the nature and circumstances of the offense" and "the history and characteristics of the defendant" pursuant to § 3553(a)(1) and "the need for the sentence imposed" pursuant to § 3553(a)(2)—the court varies upward from the advisory guidelines sentencing range of 21 to 27 months of imprisonment for VandeBrake's antitrust offenses in violation of 15 U.S.C. § 1, and imposes a sentence of 48 months of imprisonment on each count, all three sentences to run concurrently, followed by 3 years of supervised release during which VandeBrake will be required to complete 500 hours of community service, at a rate of not less than 25 hours per month. In addition, the court imposes an $829,715.85 fine on VandeBrake, which represents fifteen percent of the volume of commerce done by him in goods and services that were affected by his violations of 15 U.S.C. § 1.

Alternatively, if the court did not vary upward, after considering the totality of the circumstances in light of the § 3553(a) factors discussed above, the court would impose sentences of 27 months imprisonment on each Count; with all 27 months of the sentence on Count 3, 15 months of the sentence on Count 1, and 6 months of the sentence on Count 2 running consecutively; for a total sentence of 48 months imprisonment, followed by 3 years of supervised release during which VandeBrake would be required to complete 500 hours of community service, at a rate of not less than 25 hours per month. The court finds that such consecutive sentences, are sufficient, but not greater than necessary, to accomplish the goals of sentencing. In addition, the court would again impose a fine of $829,715.85 on VandeBrake, representing fifteen percent of the volume of commerce done by him.

### B.  Stewart

Finally, with respect to defendant Stewart, after considering the totality of the circumstances in light of the 18 U.S.C. § 3553(a) factors—and noting in particular "the nature and circumstances of the offense" and "the history and characteristics of the defendant" pursuant to § 3553(a)(1) and "the need for the sentence imposed" pursuant to § 3553(a)(2)—the court finds that a variance from the advisory guidelines sentencing range of 12 to 18 months is unwarranted and imposes a sentence of 12 months and a day of imprisonment, followed by 3 years of supervised release during which Stewart will be required to complete 100 hours of community service, at a rate of not less than 20 hours per month. Such a sentence is sufficient, but not greater than necessary, to accomplish the goals of sentencing. The court also imposes a fine on Stewart in the amount of $83,427.09. Stewart's fine represents five percent of the volume of commerce done by him in goods and services that were affected by his violation of 15 U.S.C. § 1. In addition, Stewart is ordered to pay restitution to Tri-Zack Contractor in the sum of

$25,981.80.   This Memorandum Opinion And Order Regarding Sentencing shall be attached  and incorporated by reference, in its entirety, to the Statement of Reasons and Judgment in these cases.

**IT IS SO ORDERED.**

**DATED** this 8th day of February, 2011.

_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA